United States Court of Appeals,

Eleventh Circuit.

No. 94-2314.

UNITED STATES of America, Plaintiff-Appellee, Cross-Appellant,

v.

Thomas G. BAILEY, Defendant-Appellant, Cross-Appellee.

Sept. 24, 1997.

Appeals from the United States District Court for the Middle District of Florida. (No. 91-208-CR-T-23-B), Steven D. Merryday, Judge.

Before BIRCH, Circuit Judge, GODBOLD, Senior Circuit Judge, and O'KELLEY[*], Senior District Judge.

BIRCH, Circuit Judge:

In this appeal, a firearms dealer challenges his conviction for mail fraud relating to his purchase and sale of automatic and semiautomatic weapons to law enforcement agencies and to private customers, operation of his firearms business without a license, and possession of machineguns in violation of 18 U.S.C. § 922(*o*) on the bases of sufficiency of the evidence, the constitutionality of section 922(*o*), and prosecutorial misconduct. We affirm his conviction. His sentence, which was imposed under the incorrect version of the Sentencing Guidelines and is the subject of the government's cross appeal, is vacated, and the case is remanded for resentencing.

I. BACKGROUND

In the summer of 1986, appellant, cross appellee, Thomas G. Bailey, became a federally licensed firearms dealer[1] and obtained additional authority to sell machineguns to law enforcement

---

[*]Honorable William C. O'Kelley, Senior U.S. District Judge for the Northern District of Georgia, sitting by designation.

[1]Commerce in firearms is regulated intensely by the federal government. Dealers in firearms must be licensed by the Bureau of Alcohol, Tobacco, and Firearms ("ATF" or "BATF"), and they must comply with ATF regulations governing their conduct. *See* 18 U.S.C. § 923(a)(3); 27 C.F.R. §§ 178.1-178.171. For example, dealers must operate their firearms businesses only at the locations specified on their federal licenses, 18 U.S.C. 923(a); 27 C.F.R. § 178.50; *cf.* 18 U.S.C. § 923(j); 27 C.F.R. § 178.100; they must keep detailed records of each of their firearms transactions and obtain advance approval from ATF for certain transactions, 18 U.S.C. § 923(g); 26 U.S.C. § 5812; 27 C.F.R. §§ 178.101, 178.121-178.129; and they must submit to

agencies.[2] In February, 1989, Bailey contracted with Heckler and Koch ("H & K"), a firearms

manufacturer based in Germany, which makes machineguns and semiautomatic assault rifles,[3] to

become a law enforcement firearms dealer for the company. Under the terms of this contract, Bailey

was not permitted to stock weapons for future sale to police departments; he had authority to act

---

examinations and searches by ATF inspectors, 18 U.S.C. 923(g); 27 C.F.R. § 178.23.

[2]Bailey testified that, as a federally licensed firearms dealer, he solicited "hundreds" of law enforcement agencies concerning the purchase of firearms, including machineguns. 1 Supp. R. 13-8. He sold "less than a hundred" firearms to law enforcement personnel. *Id.* Bailey marketed his firearms by displaying them at gun shows and by telephone solicitation. *Id.* at 8-9. Although Bailey's firearms business was "a one man operation," *id.* at 9, he had "a very extensive inventory. It was huge, real large," *id.* at 10. His greatest inventory of automatic weapons, including machineguns, was approximately 200 to 250, *id.,* and the average retail value of a firearm in that inventory was "about $5,000 a gun," *id.* At the highest point of the operation of his firearms business, Bailey's total inventory was valued "in excess of a million dollars." *Id.* at 11. Bailey represents that "[h]e was the largest firearms dealer in Florida." Appellant's Brief at 17. As a federally licensed firearms dealer, Bailey also offered firearms to qualified customers, including private collectors.

[3]Commerce in certain, especially dangerous firearms, such as automatic and semiautomatic weapons, is strictly regulated. An automatic weapon, or a machinegun, is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b); *see* 27 C.F.R. § 178.11. A semiautomatic weapon is "[a]ny repeating [rifle or shotgun] which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge." 27 C.F.R. § 178.11. It is a federal crime for anyone, including a licensed firearms dealer, to possess a machinegun unless (1) the weapon is being transferred by a licensed dealer to a state or federal governmental agency, such as a police department, or (2) the weapon was manufactured and lawfully possessed prior to May 19, 1986, the effective date of the federal law banning possession of machineguns. 18 U.S.C. § 922(*o*); 27 C.F.R. § 178.36; *see Farmer v. Higgins,* 907 F.2d 1041, 1042-45 (11th Cir.1990) (discussing § 922(*o*), its implementing regulations, and its effective date and corresponding "grandfather" clause).

       To sell machineguns to police agencies, a dealer must obtain advance approval from ATF and pay a special "occupational" tax. *See* 26 U.S.C. § 5801; 27 C.F.R. §§ 179.31-179.52. Effective March 14, 1989, ATF prohibited the importation of semiautomatic rifles, designated "assault" rifles primarily because of their large magazine capacity, except for use by law enforcement agencies. Among the prohibited weapons were three rifles made by H & K: the HK 91, HK 93, and HK 94 semiautomatic assault rifles. Hearing on The Flow of Precursor Chemicals and Assault Weapons from the United States into the Andean Nations Before the Select House Comm. on Narcotics Abuse and Control, 101st Cong. 205, 221, attachment 7 (1989) (Report & Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles); *see generally* 18 U.S.C. 925(d)(3); *Gun South, Inc. v. Brady,* 877 F.2d 858 (11th Cir.1989).

2

only as a middleman, who ordered from H & K the particular weapons requested by his law enforcement customers.[4] The contract further specified that H & K would sell weapons to Bailey without including federal excise tax in the price, because the weapons were to be sold to law enforcement customers solely.[5] Bailey testified that he understood that his contract with H & K and federal law prohibited his selling machineguns and assault rifles to civilians and that he understood the federal excise tax scheme, which subjected all firearms, except those sold to law enforcement agencies, to federal excise tax.

In July, 1989, Bailey met Wayne Bass, the Acting Chief of Police of Wauchula, Florida. Chief Bass told Bailey that he might want to buy a small number of assault rifles for his eight-man police department, and Bailey offered to obtain the weapons. Because of the ATF assault weapons ban and the restrictive terms of Bailey's contract with H & K, Bailey instructed Bass to write a letter authorizing Bailey to buy weapons on behalf of the Wauchula Police Department from H & K. Bailey mailed to Chief Bass a sample letter that authorized Bailey " "to place any order for any H & K full or semi-auto firearm, provided they are shipped directly to the department. The weapons and/or accessories will be used for law enforcement purposes.' " 1 Supp. R5-45-46 (quoting letter). When he read the sample letter, Chief Bass testified that he "was a little bit concerned—or not a little bit, I was quite concerned with the way it stated—its open-endedness." *Id.* at 46. Chief Bass particularly objected to the reference in the letter to automatic weapons, because he had told Bailey from the outset that the Wauchula Police Department "was not interested in full automatic firearms." *Id.* at 47.

---

[4]This restriction was designed to protect H & K's exclusive contracts with "stocking dealers," who were entitled to stock H & K weapons for future sale.

[5]Although the seller or importer of a firearm must pay a 10 or 11% federal excise tax on each sale, which may be included in the retail price of the weapon, 26 U.S.C. § 4181; 27 C.F.R. §§ 53.1-53.187, no excise is due from the seller or buyer when firearms are sold to state and local governments for their exclusive use, 26 U.S.C. § 4221(a)(4); 27 C.F.R. § 53.135. When H & K sold guns to dealers for resale to the general public, it included the excise tax in the price paid by the dealer.

When Chief Bass telephoned Bailey to express his concerns, Bailey told him that H & K wanted the letters to be open-ended to encompass all H & K products. Bailey then suggested that Chief Bass modify the letter to allow the weapons to be shipped directly to him rather than to the Wauchula Police Department. Chief Bass agreed and sent Bailey a letter of authorization, but he warned Bailey that "he must fully understand that we would only be liable for any weapon that was specifically ordered." *Id.* at 49. Furthermore, Chief Bass made it "crystal clear" that the Wauchula Police Department would be interested in buying such weapons only in the future, if at all, "because our budget was so small that there were a lot of much more needed equipment to be bought for that department than ... these exotic firearms." *Id.* at 50. Wauchula's total budget for new equipment for that year was approximately $5,000. The Wauchula Police Department never ordered any weapons from Bailey.

On September 29, 1989, Bailey used the letter of authorization sent by Chief Bass to order $30,000 of weapons from H & K, including twenty-five assault rifles (two HK 91s, two HK 93s, and twenty-one HK 94s), two pistols, a shotgun, a sniper rifle, and $6,000 of accessories. He informed H & K that the weapons were for the Wauchula Police Department. While the shotgun, sniper rifle, and pistols were sent immediately to Bailey, H & K requested and obtained approval from ATF to import assault rifles to the Wauchula Police Department. In November, 1989, H & K called Chief Bass to confirm the order of the twenty-five assault rifles for the police department. Chief Bass told H & K "that the Wauchula Police Department had not ordered any guns from H & K and I had no idea why that order was in the Wauchula Police Department's name." *Id.* at 54. He also called the ATF Tampa office. Based on Chief Bass's message, H & K did not ship the assault weapons. Bailey's conduct regarding the Wauchula Police Department resulted in his conviction on mail fraud charges in Counts II through IV of the amended, second superseding indictment.

Also in mid 1989, Joel Hodges, Assistant Commander of the Clay County, Florida Sheriff's Department SWAT team, met Bailey. At that time, the Clay County SWAT team was using HK MP5s, machineguns manufactured by H & K. Because these weapons had been manufactured and

lawfully possessed prior to 1986, and, thus, could be sold to and possessed by individuals under the provisions of 18 U.S.C. § 922(*o*)(2)(B), Bailey offered to trade three new MP5s for three of the Clay County Sheriff's Department old MP5s, and Sergeant Hodges agreed. He also expressed interest in looking at a single HK 91 assault rifle, although he did not authorize Bailey to buy this weapon for him.

In September, 1989, Bailey dictated to Sergeant Hodges an open-ended letter of authorization allowing Bailey to purchase weapons from H & K on behalf of Clay County Sheriff's Department. Sergeant Hodges signed the letter, which authorized Bailey " "to place on [Sergeant Hodges's] behalf an order for H & K restricted [automatic] firearms and accessories which will be used for law enforcement purposes only.' " *Id.* at 94 (quoting letter). Sergeant Hodges wrote a similar letter authorizing Bailey to obtain semiautomatic weapons and accessories from H & K. In addition to the three MP5s actually requested by Clay County Sheriff's Department, Bailey ordered the following weapons from H & K and represented that they also had been requested by Clay County Sheriff's Department: one HK 91 AZ assault rifle, four 20-round magazines and four 30-round magazines for the rifle, one HK 94 AZ assault rifle, and two magazine clamps. Bailey ordered the weapons and accessories to be shipped to his address. H & K sought and obtained ATF approval for the sale, but it did not ship the weapons and accessories. Bailey's actions relating to the Clay County Sheriff's Department resulted in his conviction on the mail fraud charge in Count V of the indictment.

In October, 1989, Bailey mailed a letter to Sergeant Stuart Otto of the Titusville, Florida, Police Department. In this letter, Bailey offered to trade two new HK MP5s and one HK 33 rifle for three of the Titusville Police Department's pre-1986 machineguns. Bailey requested a letter of authorization to purchase the H & K weapons on behalf of the Titusville Police Department and stated that such an authorization letter "is a requirement of the BATF." *Id.* at 71. The Titusville Police Department accepted Bailey's offer to trade the three machineguns and provided the authorization letter. Bailey used the letter to order the three MP5s requested by the Titusville Police

Department as well as four assault rifles, three pistols, one shotgun, and one rifle, valued at more than $12,000, and he falsely represented that the Titusville Police Department had ordered these weapons also. H & K submitted the paperwork on the sale to ATF, but the transfer was disapproved on January 19, 1990. Bailey's conduct concerning the Titusville Police Department resulted in his conviction for mail fraud as charged in Counts VI and VII of the indictment.

In addition to law enforcement agencies, Bailey also was convicted for mail fraud involving individuals. On February 15, 1990, Bailey mailed a letter to Charles Schaaf, a gun collector in Ft. Lauderdale, Florida, and offered to sell him his "personal original 1921ac Colt thompson submachine gun," and represented that the "weapon is in 97% plus condition." Government Exhibit 10E.[6] Schaaf testified that an "original" gun was a gun "just like it was made at the manufacturer .... original in every detail. It couldn't be retouched, it couldn't be refinished, it couldn't be reblued [a process in which the weapon is colored gun-metal blue]"; the weapon would have to be "as originally made in 1921 and just like it left the factory." 1 Supp. R8-54. Schaaf's testimony was confirmed by the testimony of a professional gunsmith hired by Bailey to repair the Thompson submachinegun, and by the National Rifle Association's gun quality standards.

Unbeknownst to Schaaf, Bailey sent the gun to be repaired by a gunsmith, who testified that the gun was pitted or rusted, lacking most of its blueing, and that the wood stock was cracked. The gunsmith testified that the Thompson submachinegun "[a]bsolutely [was] not" in ninety-seven percent plus condition when he received it.[7] *Id.* at 13. Instead, the submachinegun was "in very poor shape," *id.* at 10, with "no rating," *id.* at 13, because it was "below the poor rating," *id.,* which is less than ten percent of its original condition, *id.* at 12. The gunsmith further testified that there

---

[6]Bailey signed his letter to Schaaf as "T.G. Bailey, President [T.G. Bailey & Associates, Inc.], Law Enforcement Weapons Div." Government Exhibit 10E. The letterhead identifies Bailey's firearms business as "T.G. Bailey & Associates, Inc., Law Enforcement Weapons Division, Class II Manufacturer." *Id.*

[7]The gunsmith testified that he valued the Thompson submachinegun that he received from Bailey for refinishing at $2,200 to $2,500, 1 Supp. R8-13, and that such a gun in 97% condition "would bring anywhere from 10 to 20 thousand dollars," *id.* at 14.

is "no way to restore a gun to 97 percent condition," *id.* at 15, because guns are rated based on their original condition; "there is no rating to the gun once it's refinished. It does not qualify. A reblue is a reblue," *id.* at 13. Bailey never informed Schaaf that he was having the gun refinished.

Schaaf agreed to buy the gun and paid Bailey $12,508 for it, approximately $9,000 more than the actual value of the weapon. Although Bailey deposited Schaaf's check and spent the money, he never sent Schaaf the Thompson submachinegun. This transaction resulted in Bailey's conviction for mail fraud charged in Counts X and XI of the indictment.

Philip Parker, also a gun collector, saw Bailey's advertisement, in which he offered to sell an AK-47 rifle, in the December 20, 1991, edition of *Shotgun News.* Parker called Bailey and agreed to buy the rifle. Bailey told Parker that he would send him the required ATF transfer forms as soon as he received Parker's payment.[8] Parker sent Bailey a letter and money orders for $1,995. Government Exhibit 13A. In the first week of January, 1992, Parker telephoned Bailey because he had not received the transfer forms, and he left messages requesting Bailey to return his calls. On January 9, 1992, Parker sent Bailey another letter in which he demanded the return of his money. Bailey did not respond. Finally, on April 2, 1992, Parker wrote a letter to Bailey's attorney in which he asked the attorney or Bailey to contact him.

Shortly thereafter, Bailey called Parker and agreed to ask ATF to allow a dealer-to-dealer transfer of the AK-47 rifle so that another dealer could sell it to Parker. This conversation was memorialized in a letter, dated April 8, 1992, from Parker to Bailey. The letter clarified that it was Bailey's obligation to obtain ATF approval for the transfer. Parker never received his money or the weapon. The promised ATF transfer forms arrived on April 22, 1992. Bailey's conduct in dealing with Parker resulted in his conviction for mail fraud charged in Counts XII and XIII of the indictment.

---

[8]Under federal law, these forms had to be filed with ATF before the transfer could be approved. 26 U.S.C. § 5812.

The official ATF investigation into Bailey's firearms business, which began in November, 1989, was instigated by a complaint from Chief Bass of the Wauchula Police Department. Bass informed ATF of the weapons, including one 9mm pistol, serial number USA906, and twenty-one HK 94 assault rifles, that Bailey had ordered from H & K using the authorization letter from the Wauchula Police Department. On December 16, 1989, ATF Special Agent Charles Hudson, a thirty-year ATF veteran at the time, attended a gun show where Bailey was displaying guns. Hudson saw a 9mm pistol in Bailey's display, verified that its serial number was USA906 and asked Bailey if the gun was for sale. Bailey offered to sell the pistol to Hudson for $895.[9] In February, 1990, six months after ordering the twenty-one HK 94s under the authority of his letter from Chief Bass, Bailey offered to sell twelve HK 94s to two other firearms dealers, Duke McCaa and Khalid Akkawi.

When Bailey appeared before the grand jury on February 14 and 16, 1991, he was asked whether he had sold, or attempted to sell to civilians any of the weapons that he had ordered for the Wauchula Police Department. Bailey repeatedly answered that he had not. These responses resulted in his conviction for making a false statement before the grand jury as charged in Count XXI of the indictment.

Part of Agent Hudson's investigation included Bailey's firearms licenses. Federal firearms licenses are valid only for the location specified on the license. 18 U.S.C. § 923(a); 27 C.F.R. §§ 178.50-178.52. The address on the first license was 5243 Gulf Breeze Parkway, Gulf Breeze, Florida. This address was for a gun shop owned by Duke McCaa, one of the dealers to whom Bailey had attempted to sell the HK 94 assault rifles. Bailey did no business at McCaa's shop, and he had no ownership interest in the store.

The address on Bailey's second license was 361 South Central Avenue, Oviedo, Florida. Instead of a firearms dealership, Agent Hudson found that this address was for an accounting

---

[9]Bailey admitted that he displayed the pistol at the December 16, 1989, gun show, which "over 2,200 people attended," but he contends that the gun "was for sale to law enforcement" at the gun show. 1 Supp. R13-18, 19.

business owned by Martine Priest. At trial, Priest testified that Bailey had offered to pay her if she would accept United Parcel Service ("UPS") packages for him at her store. Bailey did not inform her that he would use her address on his federal firearms license or that he would represent her address as his business address. When Priest learned that Bailey was using her address on his business cards, she told him to destroy the cards and to stop misrepresenting her address as his own.

Because Bailey was not conducting his business at the licensed locations, Agent Hudson obtained search and inspection warrants for Bailey's home at 368 Seminole Woods Boulevard, Geneva, Florida. Although Bailey was not licensed to do business at his home, ATF agents' search of his home revealed that Bailey was conducting business there. In an office adjoining Bailey's garage, agents found rifles, pistols, machineguns, ammunition, business records, a computer, a telephone, letters, ATF firearms transfer forms, a UPS shipping label for "T.G. Bailey & Associates, Inc., 368 Seminole Woods Blvd., Geneva, FL" and other business documents showing that Bailey's actual business address was his home address. At trial, a defense witness who bought guns from Bailey testified that he had purchased the guns at Bailey's home and that Bailey was doing business from his home. This evidence resulted in Bailey's conviction for operating a firearms business without a valid license as charged in Count XIV of the indictment.

In their search of Bailey's house, ATF agents discovered that Bailey also possessed machineguns and unregistered destructive devices.[10] These weapons included: an UZI assault rifle with the serial number obliterated and a bolt that allowed the weapon to fire as a machinegun, as charged in Count XV of the indictment; a Colt AR-15 semiautomatic rifle, converted to a machinegun with the use of parts from an M-16 machinegun, as charged in Count XVI; another AR-15 semiautomatic rifle, converted to a machinegun with the use of a drop-in autosear, as charged in Count XVII; and two flash-bang hand grenades, which were not registered in the National Firearms

---

[10]A "destructive device" is defined as "any explosive, incendiary" device, such as a hand grenade. 26 U.S.C. § 5845(f); 27 C.F.R. § 178.11. Destructive devices, including the flash-bang hand grenades possessed by Bailey, must be registered in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5861(d). It is a crime to possess destructive devices if they are not so registered. *Id.*

Registration and Transfer Record, as charged in Counts XIX and XX. Bailey's possession of these weapons and destructive devices resulted in his conviction for the indicated indictment counts.

Additionally, on March 20, 1992, Bailey rented a storage locker in his name at U-Lock-It in Longwood, Florida, and placed automatic weapons and other firearms therein. On April 3, 1992, Bailey faxed a letter to ATF in which he stated that ATF had confiscated all of his weapons and that he had no inventory remaining. On the same day, Bailey changed the name on the storage locker contract from Thomas Bailey to "Citizens Investment Limited." 1 Supp. R3-81. These actions resulted in Bailey's conviction for obstructing an official investigation as charged in Count XXII of the indictment. Subsequently, ATF agents discovered the storage locker and searched it. They found rifles, silencers, and a M-14 machinegun, which resulted in Bailey's conviction for possessing a machinegun as charged in Count XVIII of the indictment.

Following a jury trial, Bailey was convicted of various crimes relating to the operation of his firearms dealership between February, 1989, and April, 1992. In summary, Bailey was convicted on ten counts of mail fraud, Counts II-VII and X-XIII,[11] in violation of 18 U.S.C. § 1341; one count of operating a firearms business without a license, Count XIV, in violation of 18 U.S.C. § 922(a)(1)(A); four counts of possessing a machinegun, Counts XV-XVIII, in violation of 18 U.S.C. § 922(*o*); two counts of possessing unregistered flash-bang hand grenades, Counts XIX-XX, in violation of 26 U.S.C. § 5861(d); one count of making a false statement to a grand jury, Count XXI, in violation of 18 U.S.C. § 1623; and one count of obstructing an official investigation, Count XXII, in violation of 18 U.S.C. § 1505. Bailey was sentenced under the November, 1989, edition of the Sentencing Guidelines to time served to be followed by a three-year term of supervised release, and he was ordered to pay $15,446.41 in restitution. On appeal, Bailey contests his conviction on the bases of sufficiency of the evidence, the constitutionality of 18 U.S.C. § 922(*o*), and prosecutorial

_____

[11]One count of mail fraud, Count I, was dismissed, and Bailey was acquitted on two other counts of mail fraud, Counts VIII and IX.

misconduct. The government cross appeals that he was sentenced under the incorrect version of the Sentencing Guidelines.

## II. ANALYSIS

A. *Sufficiency of the Evidence*

Bailey raises two challenges to his convictions on sufficiency of the evidence. First, he argues that his ten convictions for mail fraud are invalid because he had no fraudulent intent and because he did not deprive his victims of any property right. Second, he claims that his conviction for operating a firearms business without a license cannot stand because the evidence does not establish that he conducted business at his home as opposed to the locations reflected on his licenses.

We review challenges to sufficiency of the evidence *de novo,* but "we examine the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict." *United States v. Massey,* 89 F.3d 1433, 1438 (11th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 983, 136 L.Ed.2d 865 (1997). "To prove mail fraud, the government must show that the defendant (1) intentionally participated in a scheme to defraud and (2) used the mails to execute the fraudulent scheme." *United States v. Hooshmand,* 931 F.2d 725, 731 (11th Cir.1991). The government must establish only that the fraudulent scheme existed; conviction for mail fraud "need not rest on the success of the fraudulent scheme." *United States v. Wingate,* 997 F.2d 1429, 1433 (11th Cir.1993); *see United States v. Dynalectric Co.,* 859 F.2d 1559, 1576 (11th Cir.1988) ("[C]onviction under the federal mail fraud statute only requires the government to prove a scheme to defraud; the success or failure of the scheme is irrelevant."). "The Government need not produce direct proof of scienter in a [mail] fraud case, however; circumstantial evidence of criminal intent can suffice." *United States v. Hawkins,* 905 F.2d 1489, 1496 (11th Cir.1990).

Counts II through VII charged Bailey with defrauding the Internal Revenue Service ("IRS") and H & K by overstating or fabricating the orders of his law enforcement customers for restricted weapons. Under federal law and the terms of his contract with H & K, Bailey could buy

11

machineguns and assault weapons solely for direct sale to law enforcement agencies. *See* 18 U.S.C. § 922(*o*)(2)(A). The evidence showed, however, that Bailey used the authorization letters that he requested from the Wauchula and Titusville Police Departments as well as the Clay County Sheriff's Department to order weapons that these law enforcement agencies never requested. Thus, Bailey avoided paying federal excise tax because weapons sold to law enforcement agencies are exempt from that tax. *See* 26 U.S.C. 4221(a)(4). Bailey used the federal mails to execute his scheme.

Bailey's argument that he ordered weapons from H & K to sell to law enforcement agencies and without any fraudulent intent to sell them to individuals is hollow. The jury was entitled to reach the opposite conclusion based on the following evidence: Bailey obtained open-ended letters of authorization covering weapons not requested by his law enforcement customers; he falsely represented that either H & K or ATF required such open-ended language; the letters directed H & K to send the weapons to Bailey and not to the law enforcement agencies so that they would not discover his fraud; Bailey ordered dozens of restricted weapons worth thousands of dollars and in excess of those requested by law enforcement agencies; and he attempted to sell these weapons to civilians, such as Agent Hudson, acting in an undercover capacity at the December 16, 1989, gun show, and two firearms dealers, Duke McCaa and Khalid Akkawi. This evidence was sufficient for a rational jury to conclude that Bailey intended to deceive the law enforcement agencies, H & K, and ATF into believing that he was ordering the weapons for law enforcement use, when he intended to sell the weapons on the open market in violation of his federal license and his contract with H & K.[12]

_____

[12]Significantly, the IRS and H & K were deceived as well as defrauded, which eviscerates Bailey's argument, relying on *United States v. Lew,* 875 F.2d 219 (9th Cir.1989), that, if fraud did occur, it did not harm those allegedly defrauded. Bailey deceived H & K by representing that he was ordering restricted weapons for his law enforcement customers, when he was ordering the weapons for sale to individuals. This representation also deceived the IRS because weapons ordered for law enforcement purposes are not subject to excise tax. Thus, Bailey defrauded both H & K and the IRS because his scheme was designed to obtain restricted weapons in violation of his contract with H & K and without paying federal excise tax. Therefore, his conviction actually satisfies the standard announced in *Lew* that "the intent must be to obtain money or property from the one who is deceived." *Id.* at 221.

Bailey also argues that the evidence did not demonstrate actual injury under the mail fraud statute. Although his scheme was foiled before H & K shipped the assault rifles that he ordered, the validity of his conviction is not undermined. The plain language of the mail fraud statute requires only a " "scheme or artifice to defraud' " using the mails and not the success of that scheme. 18 U.S.C. § 1346. We repeatedly have held that a mail fraud conviction does not depend on the success of the fraudulent scheme. *See, e.g., Wingate,* 997 F.2d at 1433; *United States v. Cox,* 995 F.2d 1041, 1045 (11th Cir.1993); *United States v. Ethridge,* 948 F.2d 1215, 1217 (11th Cir.1991) (per curiam); *Hooshmand,* 931 F.2d at 731; *Dynalectric Co.,* 859 F.2d at 1576.

Bailey also challenges his mail fraud convictions relating to individual customers in Counts X-XIII of the indictment because he contends that he lacked fraudulent intent. He represents that he entered into these transactions with Charles Schaaf and Philip Parker with the good faith intention to deliver the subject firearms but was unable to fulfill his commitment to each customer because of the ATF investigation. Regarding the sale of the Thompson submachinegun to Schaaf in Counts X and XI, Bailey's letter to Schaaf certified that his 1921 AC Colt Thompson submachinegun was in ninety-seven percent plus condition, when the gun actually was below ten percent of its original condition and could never be restored to ninety-seven percent condition. Furthermore, Bailey's asking price of over $12,000 was consistent with an original, unrefinished Thompson submachinegun and was substantially more than the weapon would be worth even if it were restored completely. Bailey deposited Schaaf's check and spent the money, but he never sent Schaaf the

Bailey's reliance on *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), for his contention that his mail fraud convictions are invalid because he did not deprive his victims of a property right also is without merit. In *McNally,* the Court held that the mail fraud statute requires proof of a deprivation of money or property and does not extend to a deprivation of the intangible right to honest services. As Bailey concedes, *McNally* was overruled legislatively. *See* Appellant's Brief at 46 n.16. In the Anti-Drug Abuse Act of 1988, Pub.L. No. 100-690, § 7603(a), 102 Stat. 4508 (codified as amended in 18 U.S.C. 1346), Congress provided that "the term "scheme or artifice to defraud' [in the mail fraud statute] includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. The effective date of that amendment, November 18, 1988, predates Bailey's mail fraud scheme charged in the indictment, which began on February 21, 1989. Consequently, *McNally* does not apply to Bailey's crimes.

13

Thompson submachinegun. Based on this evidence, the jury was entitled to conclude that Bailey intentionally misrepresented the condition of the weapon and thereby intended to defraud Schaaf.

Concerning the AK-47 rifle sale to Parker, Counts XII and XIII of the indictment, Bailey agreed that, when Parker sent him the money orders, he would send Parker the required ATF transfer forms. On December 19, 1991, Parker sent Bailey money orders for $1,995. Despite Parker's repeated telephone calls and letters, Bailey did not send Parker the transfer forms until April, 1992, after the criminal case against him had begun. The jury was entitled to infer from these facts that Bailey never intended to send Parker the gun.

Although Bailey argues that the ATF investigation prevented him from honoring his agreements with Schaaf and Parker, the jury could have rejected his contention and determined that ATF was not responsible for Bailey's actions. The evidence need not exclude every hypothesis of innocence or be completely inconsistent with every conclusion other than guilt because a jury may select among constructions of the evidence. *United States v. Harris,* 20 F.3d 445, 452 (11th Cir.1994). The evidence of fraud in the respective sales to these individual customers was independent of the ATF investigation. Bailey misrepresented the condition of the Thompson submachinegun that he sold to Schaaf. Bailey promised to send Parker the ATF transfer forms when he received Parker's money orders for the AK-47 rifle. Although Bailey received the money orders in December, 1991, he did not send the transfer forms until April, 1992. Instead of hindering Bailey's efforts to perform his part of the bargain with Parker, the ATF investigation caused Bailey to uphold his part of the sale with Parker. Thus, the ATF investigation was independent of these sales, and the jury could infer Bailey's fraudulent intent from his actions alone. We conclude that the evidence was sufficient to support Bailey's convictions for mail fraud.

Bailey further contends that the evidence was insufficient to sustain his conviction for dealing in firearms without a license as charged in Count XIV of the indictment. Bailey disputes neither that he was "engage[d] in the business of importing ... or dealing in firearms," 18 U.S.C. § 922(a)(1)(A), nor that it was illegal for him to engage in that business at his home, where he was not

14

licensed, *see* 18 U.S.C. § 923(a). He argues instead that he was not actually operating his firearms business at his home. Yet, the evidence showed that, on March 14, 1990, ATF agents searched Bailey's house and found in an office adjoining his garage rifles, pistols, machineguns, ammunition, business records, a computer, a telephone, letters, ATF transfer forms, a UPS shipping label for "T.G. Bailey & Associates, Inc." located at "368 Seminole Woods Blvd., Geneva, Florida" and other business documents showing that Bailey's business was located at his home address. *See* Government Exhibits 14E-G. A defense witness testified that he bought guns at Bailey's home and that Bailey was doing business out of his home. 1 Supp. R10-259. Because Bailey kept guns, ammunition, and business records at his home, represented his home address as his business address, and sold weapons to customers at his house, the jury was entitled to conclude that Bailey was operating his firearms business at his house despite the fact that his two firearms licenses respectively gave the addresses of Duke McCaa's gun shop and Martine Priest's accounting business. "In determining whether one is engaged in the business of dealing in firearms, the finder of fact must examine the intent of the actor and all circumstances surrounding the acts alleged to constitute engaging in business." *United States v. Palmieri,* 21 F.3d 1265, 1268 (3d Cir.), *vacated on other grounds,* 513 U.S. 957, 115 S.Ct. 413, 130 L.Ed.2d 329 (1994). We conclude that there was sufficient evidence to determine that Bailey was conducting his firearms business at his home without a license for that location.

B. *Constitutionality of 18 U.S.C. § 922(o)*

Bailey argues that his conviction under 18 U.S.C. § 922(*o*), which prohibits the possession and transfer of machineguns after May 19, 1986,[13] is invalid because the statute is unconstitutional.

---

[13]The statute at issue, 18 U.S.C. § 922(*o*), states:

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
>
> (2) This subsection does not apply with respect to---
>
>> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a

He contends that section 922(*o*) exceeds the power of Congress under the Commerce Clause[14] because there is an insufficient nexus to interstate commerce. Bailey supports his argument with *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), in which the Supreme Court determined that a subsection of the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), violated the Commerce Clause.

This court has determined that the legislative history for section 922(*o*) "reveal[s] clearly (1) that Congress intended to change the law to prospectively preclude the private possession of machine guns, and (2) that Congress intended to limit lawful transfer and possession of machine guns to instances authorized by the government for the benefit of federal, state, or local governmental entities."[15] *Farmer v. Higgins,* 907 F.2d 1041, 1045 (11th Cir.1990). We also have held that section 922(*o*) is constitutional under the Commerce Clause. *United States v. Wright,* 117 F.3d 1265, 1268-71 (11th Cir.1997). We decided that section 922(*o*) satisfied the third *Lopez* category of activities affecting commerce[16] and concluded that "Congress had a rational basis to

---

department, agency, or political subdivision thereof; or

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(*o*) (1994); *see* Firearms Owners' Protection Act of 1986, Pub.L. No. 99-308, § 110(c), 100 Stat. 449, 461 (May 19, 1986) (providing that, under section 110(c) of the Firearms Owners' Protection Act, the effective date of the "Machinegun Prohibition" is May 19, 1986). This court previously has determined that "the plain language of section 922(*o*), as well as its legislative history ... prohibits the private possession of machine guns not lawfully possessed prior to May 19, 1986." *Farmer v. Higgins,* 907 F.2d 1041, 1045 (11th Cir.1990).

[14]Under the Commerce Clause, Congress has authority "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3.

[15]Our court also recognized that the Bureau of Alcohol, Tobacco and Firearms has promulgated regulations implementing the ban placed on private possession and transfer of machine guns as of 1986, *Farmer,* 907 F.2d at 1043, as well as the deference that we ascribe to agency interpretation, *id.* at 1045. *See* 27 C.F.R. § 179.105(a), (b), (e).

[16]In *Lopez,* the Supreme Court reiterated three categories of activity that Congress can regulate under the Commerce Clause: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "those activities having a

16

determine that a total ban on machineguns would have a substantial effect on interstate commerce."[17] *Id.* at 1270. We distinguished the total prohibition on the possession and transfer of machineguns by private individuals from the *Lopez* restricted regulation on the possession of firearms in school zones, "a limited, discrete geographic sphere."[18] *Id.* at 1269; *see Lopez,* 514 U.S. at 567, 115 S.Ct. at 1634 (determining that "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce"); *United States v. Walker,* 59 F.3d 1196, 1198 (11th Cir.1995) (explaining that, because section 922(q) " "neither regulates a commercial activity nor contains a requirement that the possession be connected in any way to interstate commerce,' the Supreme Court held that in enacting the provision Congress exceeded its power to regulate interstate commerce." (quoting *Lopez,* 514 U.S. at 551-52, 115 S.Ct. at 1626)), *cert. denied,* --- U.S. ----, 116 S.Ct. 547, 133 L.Ed.2d 450 (1995). In *Wright,* we join all the other circuits that have addressed a Commerce Clause challenge to section 922(*o*) since *Lopez* with the unanimous determination that this statute is constitutional.[19] *See Wright,* 117 F.3d at 1270-71 n. 9 (listing the other circuits that have determined section 922(*o*) to be constitutional under the Commerce Clause). Accordingly, Bailey's challenge to section 922(*o*) under the Commerce Clause is meritless.

substantial relation to interstate commerce." 514 U.S. at 557-61, 115 S.Ct. at 1629-30; *see Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971).

[17]*See also Wright,* 117 F.3d at 1270(determining that, "[b]ecause § 922(*o*) has no jurisdictional element, it has the potential to criminalize the possession of such [machine]guns that have never traveled in interstate commerce").

[18]Furthermore, our circuit has recognized that *Lopez* is not a panacea to invalidate all regulations involving firearms. *See Cheffer v. Reno,* 55 F.3d 1517, 1520-21 (11th Cir.1995) (finding the Freedom of Access to Clinic Entrances Act of 1994, relating to abortion clinics, not to be analogous to the *Lopez* analysis because the regulated activity substantially affects interstate commerce). "It appears that *United States v. Lopez* has raised many false hopes. Defendants have used it as a basis for challenges to various statutes. Almost invariably those challenges fail." *United States v. Bell,* 70 F.3d 495, 497 (7th Cir.1995) (citing cases).

[19]As we recognized in *Wright,* some other circuits have upheld the constitutionality of § 922(*o*) based on the first two *Lopez* categories of activity that Congress may regulate under the Commerce Clause: channels of commerce and instrumentalities or things in interstate commerce. *See Wright,* 117 F.3d at 1270 n. 7.

C. *Prosecutorial Misconduct*

On appeal, Bailey raises four issues concerning alleged prosecutorial misconduct. He contends that (1) Agent Hudson committed perjury regarding certain tape-recorded evidence, (2) the government failed to disclose that Duke McCaa was an ATF informant and to produce his ATF file, (3) the government failed to reveal certain exculpatory evidence, and (4) the prosecutor's closing argument was improper. We address his contentions seriatim.

1. Alleged Misconduct Relating to Tape-Recorded Evidence

In conducting his investigation of Bailey's firearms activities, Agent Hudson obtained authorization to make consensual tape recordings of certain conversations. Among those recorded conversations was a telephone conversation between Agent Hudson and Martine Priest, owner of the accounting business where Bailey was licensed to deal firearms and at which address he received firearms shipments. Agent Hudson's conversation with Priest revealed that she was not involved in any wrongdoing and that she received packages for Bailey at her business. Agent Hudson inadvertently forgot about the Priest conversation being on the tape and failed to mention it in any of his electronic surveillance reports. That same day, he rewound the tape and recorded over his conversation with Priest a conversation between an inspector and Bailey's wife. This tape, admitted into evidence as Government Exhibit 27A, contained the full conversation between the inspector and Bailey's wife immediately followed by the remaining portion of the conversation between Agent Hudson and Priest.

Two years after the Priest conversation was recorded and more than a year prior to trial, copies of all tape-recorded evidence, including the tape containing the extant portion of the Priest conversation, were given to the defense. Agent Hudson had forgotten, and the prosecutor never knew of the portion of the Priest conversation that was on the tape. At trial, Agent Hudson testified about the tape recordings made during the investigation of Bailey and, without including the taped conversation with Priest, stated that those were the only conversations that he recorded. Although Agent Hudson testified about his conversation with Priest, he did not testify that the conversation

18

was recorded, and he was not asked about the Priest tape on cross-examination. Priest testified that Bailey had represented the address of her accounting firm as the address of his firearms business.

After the government completed its case in chief, the defense requested an *ex parte* hearing with the court. The defense then revealed the existence of the Priest conversation on its copy of Government Exhibit 27A and argued that Agent Hudson had committed perjury by not mentioning the conversation during his direct examination. The court allowed the defense not to disclose the Priest conversation to ensure that Agent Hudson would have no time to consider his explanation and response. The defense then called Agent Hudson and questioned him about the taping that he had conducted. Again, Agent Hudson did not mention that he taped his conversation with Priest, and the defense did not reveal the existence of the Priest tape.

During Bailey's testimony, his attorney played the Priest tape for the jury, and Bailey identified the voices of Agent Hudson and Priest. Bailey's attorney then moved to dismiss the indictment "for perjury which was committed in this courtroom." 1 Supp. R13-113. Although the prosecutor suggested that Agent Hudson be recalled so that the district judge could question him regarding the alleged perjury, the district judge addressed the issue with Bailey's attorney and the prosecutor as follows:

> Your [defense] position is that the perjury is his statement that he made no other recordings when in fact he made one?
>
> ....
>
> [I]f every testimonial error constituted perjury, the courts would be flooded with them.
>
> ....
>
> [T]here are [ele]ments of perjury other than failure of recollection or mistake, even assuming that that's what occurred.
>
> ....
>
> I'm not going to direct Mr. Hudson to take the stand, unless you want to call him in rebuttal. It's your decision or whatever else you want to do in presenting your case. But I can't at this moment conceive of summarily adjudicating based on what I've heard in a manner—or the logical inference of which would be that I have found him guilty of perjury based on this.

*Id.* at 115, 116, 120.

19

The government called Agent Hudson in rebuttal to explain the existence of the Priest tape.

Agent Hudson testified about this tape as follows:

> It was authorized. It was under the same authorization that was made on March the 9th, I think it was, of 1990. But I didn't testify to it. I frankly forgot that it had occurred. But it did occur and it was authorized, yes.
>
> ....
>
> I was correct to the best of my memory at the time. Obviously now I'm embarrassed to say that I didn't remember that one.

R17-4.[20] Interestingly, the original government tape, Government Exhibit 27A, that was admitted

into evidence did not contain the Priest conversation, while the defense exhibit, Defendant's Exhibit

---

[20]Bailey contends that the Priest tape was unauthorized because Agent Hudson's internal BATF electronic surveillance authorization forms list only Bailey's name and that Agent Hudson testified falsely about the Priest tape to conceal that breach. As reflected in ATF Order 3530.2, which governs electronic surveillance, ATF agents are permitted to record any person connected with the investigation of the individual identified on the electronic surveillance authorization form. *See Electronic Surveillance,* Dep't of the Treasury, Bureau of Alcohol, Tobacco & Firearms, ATF Order 3530.2 (July 17, 1989). Priest was such a person because Agent Hudson had obtained her address listed as the business address for Bailey. Thus, until he questioned her, Agent Hudson had no way of knowing her involvement in Bailey's firearms business. Agent Hudson had no reason to testify falsely about the Priest tape because it was authorized by ATF rules.

Similarly, Bailey's contention that Agent Hudson acknowledged that recording a telephone conversation without authorization was a felony is meritless. Agent Hudson testified that it was "[g]enerally" a crime for an ordinary citizen to record conversations, but that it was not a crime for a law enforcement officer to do so. R10-79. Florida law expressly provides that "[i]t is lawful ... for an investigative or law enforcement officer or a person acting under the direction of an investigative or law enforcement officer to intercept a wire, oral, or electronic communication when such person is a party to the communication or one of the parties to the communication has given prior consent to such interception and the purpose of such interception is to obtain evidence of a criminal act." Fla. Stat. § 934.03(2)(c). Furthermore, federal law governs the admissibility of evidence in a federal prosecution, even if the evidence is obtained in violation of state law, *United States v. Malekzadeh,* 855 F.2d 1492, 1496 (11th Cir.1988), or in violation of internal governmental regulations, *United States v. Caceres,* 440 U.S. 741, 754 & n. 18, 99 S.Ct. 1465, 1472-73 & n. 18, 59 L.Ed.2d 733 (1979). In the course of his criminal investigation of Bailey, Agent Hudson's recording of his conversation with Priest was entirely lawful.

Bailey also argues that Agent Hudson first admitted that he erased the Priest tape and then denied erasing it. Agent Hudson's testimony, however, was consistent. He said that he taped over the Priest conversation, but that he did so inadvertently.

18, copied from the government tape, did contain the Priest conversation.[21] Both exhibits were admitted into evidence and submitted to the jury, which was informed that Government Exhibit 27A did not contain the Priest conversation. During his closing argument, Bailey's attorney urged the jury to listen to both tapes during deliberations and stressed Agent Hudson's alleged perjury regarding the Priest conversation.

After Bailey's conviction, his attorney filed a motion for judgment of acquittal based on Agent Hudson's alleged perjury. The district court denied the motion because the prosecutor did not know about the perjury and Agent Hudson's alleged perjury was explored on cross-examination, which removed any possible prejudice to the defense. On appeal, Bailey renews his contention that Agent Hudson committed perjury and that the indictment must be dismissed.

"To obtain a reversal on the grounds that the government relied on perjured testimony, the following must be shown: (1) the contested statements were actually false, (2) the statements were material, and (3) the prosecution knew that they were false." *United States v. Blackburn,* 9 F.3d 353, 357 (5th Cir.1993). Instead of showing perjury, we conclude that Bailey has demonstrated nothing more than a memory lapse, unintentional error, or oversight by Agent Hudson. *See United States v. Payne,* 940 F.2d 286, 291 (8th Cir.1991) (determining that perjury was not established by the fact that "testimony is challenged by another witness or is inconsistent with prior statements" and recognizing that "not every contradiction in fact or argument is material"). The jury clearly credited Agent Hudson's testimony because it found Bailey guilty on twenty of twenty-two counts, and Agent Hudson was essential to the government's case. In their closing arguments, both the prosecutor and Bailey's counsel urged the jury to not convict Bailey if they determined that he had testified falsely.

---

[21]Because Bailey's attorney did not recall Agent Hudson when he had the opportunity to do so, Agent Hudson was not asked specifically about the absence of the Priest conversation from Government Exhibit 27A, and he did not attempt to explain it. He did testify that he had a "trainee" working with him during the copying process. R17-12. He further testified that he "made another copy of the Priest portion of the conversation and then a copy of the Mrs. Bailey portion of the conversation to have working copies. That's my recollection." *Id.* Nevertheless, the defense copy of Government Exhibit 27A, Defense Exhibit 18, was the only copy of the Priest conversation made by the government.

By returning a guilty verdict, the jury rejected Bailey's contention that Agent Hudson had testified falsely.

Furthermore, there was no incentive for Agent Hudson to misrepresent the existence of the Priest tape because it was not helpful to the defense. Priest was a friendly government witness, and her testimony was damaging to Bailey because she confirmed Agent Hudson's account of their conversations. As the prosecutor explained in his closing argument, "[i]f someone were going to pick something to get rid of in this case it wouldn't be a tape recording involving Martine Priest" because that tape was not exculpatory. 1 Supp. R15-162. Agent Hudson had nothing to gain and everything to lose by erasing or testifying falsely about the Priest tape. Significantly, the entire tape was not erased, which substantiates the credibility of his explanation. As Agent Hudson testified, "[i]f [I] was going to be erasing evidence, I suppose the whole thing would have been erased." R17-18.

Agent Hudson was testifying about a tape recording that had occurred more than three years prior to trial, which tape he had forgotten until Defendant's Exhibit 18 was admitted into evidence. Bailey's attorney even surprised Agent Hudson with Defendant's Exhibit 18 so that he would not be able to consider his response. If Agent Hudson's explanation was erroneous, then it was an inadvertent error because of his deficient memory after three years. Additionally, Bailey has not suggested any reason why Agent Hudson would have testified falsely about the procedures used to copy the tapes in pretrial discovery. Bailey has presented no reasonable basis for concluding that Agent Hudson's explanation concerning the Priest tape was perjurious.

We also conclude that the alleged perjury relating to the Priest tape was not material to Bailey's conviction or did not corrupt "the truth-seeking function of the trial process" and, thus, had no effect on the jury's verdict. *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *see Blackburn,* 9 F.3d at 357; *see also DeMarco v. United States,* 928 F.2d 1074, 1077 (11th Cir.1991) ("A conviction must be overturned which rests in part upon the knowing use of false testimony if there is any reasonable likelihood that the false testimony could have

22

affected the judgment of the jury."). The alleged false testimony plainly had no bearing on Bailey's convictions. Agent Hudson did not deny having a conversation with Priest, he merely failed to mention that he had taped it. Thus, the perjury in this case relates to the taping and not to the conversation. Whether or not Agent Hudson recorded the conversation with Priest has no relevance to whether Bailey committed mail fraud, possessed machineguns, sold firearms out of his home, obstructed an investigation, or committed perjury. Even if Agent Hudson had testified falsely about the content of the taped conversation, rather than the mere fact of the taping, no relief would be warranted. Because Priest testified, Agent Hudson's alleged perjury is not material. In his closing argument, Bailey's attorney characterized the recorded conversation between Agent Hudson and Priest as "[i]nnocuous" and containing "nothing really significant." 2 Supp. R1-19. Further, the district court correctly found that Bailey had ample opportunity to exploit Agent Hudson's inconsistent testimony and to attack his credibility before the jury. Consequently, there is no basis for concluding that Agent Hudson's alleged perjury was material to the verdict: if the jury had concluded that Agent Hudson's testimony was false, then it would have disregarded the testimony; if not, there was no falsehood to disregard. *See United States v. Gowen,* 32 F.3d 1466, 1471 (10th Cir.1994), *cert. denied,* 513 U.S. 1173, 115 S.Ct. 1151, 130 L.Ed.2d 1109 (1995); *see also United States v. Blair,* 958 F.2d 26, 29 (2d Cir.1992) ("[P]erjured testimony must have remained undisclosed during trial in order to require reversal of a conviction.").

Significantly, "[o]nly knowing use of perjured testimony constitutes a due process violation." *United States v. Lopez,* 985 F.2d 520, 524 (11th Cir.1993); *see United States v. Michael,* 17 F.3d 1383, 1385-86 (11th Cir.1994). Even if Agent Hudson had testified falsely about the Priest tape, Bailey is not entitled to relief because the prosecutor had no knowledge of the perjury. The defense resorted to an *ex parte* hearing to avoid disclosing the Priest tape to the prosecutor. Bailey faults the prosecutor for failing to correct Agent Hudson's alleged perjury after the fact, but the prosecutor's conduct was proper. Confronted with an unexpected claim that Agent Hudson had testified falsely about the Priest tape, he recalled Agent Hudson on rebuttal and subjected him to

23

cross-examination on the issue, despite the court's willingness to reject Bailey's claim without hearing from Agent Hudson. The district court correctly concluded that no relief was available for prosecutorial misconduct because the prosecutor did not know of Agent Hudson's alleged perjury and this incident has not been shown to have affected Bailey's conviction. *See United States v. Colston,* 936 F.2d 312, 316 (7th Cir.1991) ("A prosecutor has an obligation to notify the court whenever he *knows* that a witness has committed perjury, but failure to notify is a basis for reversal only if it affects the fairness of the trial." (citations omitted) (emphasis added)).

2. Alleged Misconduct Relating to Duke McCaa

Bailey contends that Duke McCaa, one of the firearms dealers to whom he tried to sell HK 94 assault rifles, was an ATF confidential informant. He argues that the government failed to review McCaa's ATF file to determine whether he was testifying pursuant to a plea agreement. The existence of a plea agreement would have provided impeachment evidence for use by Bailey's attorney in cross-examining McCaa. Thus, Bailey asserts a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See Giglio v. United States,* 405 U.S. 150, 154-55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

> [T]o establish a *Brady* violation, a defendant must prove: (1) that the state possessed evidence favorable to the defendant;(2) that he did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and, (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*Routly v. Singletary,* 33 F.3d 1279, 1285 (11th Cir.1994) (per curiam), *cert. denied,* --- U.S. ----, 115 S.Ct. 2627, 132 L.Ed.2d 867 (1995). The evidence revealed that, prior to July, 1988, McCaa had been approached by Filipinos sympathetic to the Marcos regime who wanted to purchase firearms for export to the Philippines and by Haitians who wanted to purchase illegal machineguns during an uprising in Haiti. McCaa reported both instances to ATF. He testified that he was not given any benefit for these reports. R14-36. After July, 1988, and this information, and, again, in January, 1990, McCaa's business records passed ATF inspections. Thereafter, he was approached by Agent Hudson in this case.

In a proffer outside the presence of the jury, McCaa testified that he was not appearing pursuant to any agreement with the government or ATF. He specifically informed the court that he had not been paid by ATF for reporting the people who had approached him, that he had not been contacted by ATF for information, and that he had not been found doing anything unlawful by ATF. *Id.* at 13-15. He testified that his reports to ATF were his civic duty to report crime; he further confirmed that he was testifying pursuant to subpoena, and that he did not expect and had not been promised any benefit in return for his testimony at Bailey's trial.[22] *Id.* at 14-15. McCaa testified that he did not consider himself to be a confidential informant.[23] *Id.* at 15. Following the proffer, this testimony was repeated in substance to the jury. *Id.* at 30-31. Bailey's attorney inquired into whether ATF had a file on McCaa that had not been produced to the defense. The lead prosecutor represented to the court that, not only did he not know whether there was an ATF file on McCaa but also that Bailey's counsel did not request the court to order the government to search for and to produce McCaa's file, and the court did not enter such an order.

Actually, ATF did have a file on McCaa at the time of Bailey's trial. That file, however, contains nothing exculpatory relating to Bailey.[24] The file shows no evidence of any regulatory

---

[22]During the proffer, the government attorney explained to the district judge that McCaa "had no expectation of leniency, he had no expectation of any benefit from his testimony in this case." R14-20.

[23]In response to Bailey's attorney's question as to whether he was an ATF confidential informant, McCaa responded that he was "not sure that that's what I am is a confidential informant, but I know that at one time I was approached—I've been approached more than once—to sell illegal firearms to people from out of the country, and I called ATF in regards to that and they photographed me, so I guess that—if that's what a confidential informant is, that's what I am." R14-12-13.

[24]In addition to the Haitian and Filipino investigations, McCaa's ATF file, produced under seal to this court for *in camera* review identifies five separately numbered ATF investigations in which he has given information since 1988. *See United States v. Rivera Pedin,* 861 F.2d 1522, 1528 (11th Cir.1988) (*in camera* review of Jencks Act, 18 U.S.C. § 3500, material concerning an appellate issue produced to this court). The government also submitted a letter describing McCaa's involvement in these investigations from the Acting Resident Agent in charge of the Pensacola ATF Office. This previously undisclosed information shows that McCaa cooperated with law enforcement officers as a concerned citizen without any hope or promise of reward. Nothing in the ATF McCaa file is exculpatory concerning Bailey.

violations by McCaa or his business. Significantly, McCaa's ATF file does not contain a plea agreement or any other promises of leniency. Therefore, the file confirms McCaa's trial testimony, prosecutors' statements that McCaa was not promised anything in return for his testimony, and McCaa's cooperation with ATF as a concerned citizen without any promise of reward. Because McCaa's ATF file contained nothing exculpatory to Bailey and, thus, could not have affected his conviction, Bailey has failed to establish a *Brady* violation regarding McCaa's ATF file.

3. Alleged Failure to Disclose Other Exculpatory Evidence

Bailey contends that he learned at trial that the government had a letter from McCaa's secretary that corroborated his testimony. His apparent reference is to an envelope and note found by ATF Inspector Kim Irwin with Bailey's firearms license for the address of McCaa's gun shop at 5243 Gulf Breeze Parkway, Gulf Breeze, Florida, Defendant's Exhibit 61. Inspector Irwin located this evidence during the search of Bailey's home on March 14, 1990. The envelope had Duke McCaa's return address on it, and the note, which requested that Bailey sign and return the license, was from Mary Graham, wife of McCaa's business partner. Bailey argues that the license confirms his testimony that he had entered into a deal with McCaa to sell firearms from McCaa's store; therefore, it explained his use of McCaa's address on his federal firearms license. Although Bailey does not cite any authority for his claim that this information was discoverable or that the government was tardy in producing it, he appears to be alleging a *Brady* violation.

Contrary to Bailey's contention, the license and attachments were given to the defense well in advance of trial. Even if the government had provided these documents to Bailey's counsel during trial, a *Brady* violation occurs "only if the defendant can show prejudice, *e.g.,* the material came so late that it could not be effectively used." *United States v. Beale,* 921 F.2d 1412, 1426 (11th Cir.1991); *see United States v. Knight,* 867 F.2d 1285, 1289 (11th Cir.1989) ("Appellants received the information during the trial and have failed to demonstrate that the disclosure came so late that it could not be effectively used; and thus they cannot show prejudice."). Bailey's counsel stated at trial that, "in preparing for what we anticipated might be Inspector Kim Irwin's testimony today, we

discovered something [Bailey's license and attachments] that we believe is clearly *Brady* material that had not come to our attention because it wasn't associated with Mr. McCaa, it was associated with Mr. Irwin." 1 Supp. R9-3. The license and attachments were handed to defense counsel and admitted into evidence as Defendant's Exhibit 61 during the testimony of Inspector Irwin, 1 Supp. R10-67, and this defense exhibit was used subsequently during the examination of Duke McCaa, R14-25-26. Because Bailey did not assert that he suffered any prejudice at trial, and he does not identify any prejudice on appeal, this contention is without merit, even if the documents were disclosed at trial.

Bailey also contends that he first learned at trial that Agent Hudson had recorded an incriminating statement allegedly made by Bailey at the Tampa Gun Show on December 16, 1989. His apparent reference is to the written note memorializing the serial number of the pistol Bailey tried to sell to Agent Hudson at the gun show. That note states:

Sat. 12/16/89-Tampa Fair Grounds, Sun Coast Gun Collectors Show

12:15 pm-T.G. Bailey-numerous T-II and T-I firearms. A sign "I guarantee law enforcement certification anywhere."

Observed a .380 cal. pistol P7K3, USA-906, for sale. Bailey said the gun was for sale for $895. Said all the other guns were also for sale.

I told of friend in Plant City who tried to buy A/W [automatic weapon] but couldn't get the law enf. cert. Bailey said, "I can guarantee them." I said, "how in the hell can you do that?" He said "that's all I can say, I can guarantee it."

Government Exhibit 62.

Although Bailey does not cite authority supporting his contention that the note was discoverable, he appears to rely on Federal Rule of Criminal Procedure 16. A properly preserved Rule 16 discovery violation constitutes "reversible error only when it violates a defendant's substantial rights." *United States v. Camargo-Vergara,* 26 F.3d 1075, 1080 (11th Cir.1994). "Substantial prejudice exists when a defendant is unduly surprised and lacks an adequate opportunity to prepare a defense or if the mistake substantially influences the jury." *Id.* Since Bailey did not

object at trial to the allegedly late disclosure of Agent Hudson's note, our review standard is plain error. *See United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

Because Rule 16(a)(1)(A) requires government disclosure only of a defendant's oral statements made "in response to interrogation by any person *then known* to the defendant to be a government agent," a defendant's voluntary statements made to individuals that the defendant did not know were government agents do not come within the ambit of this rule. Fed.R.Crim.P. 16(a)(1)(A) (emphasis added); *see United States v. Cochran,* 697 F.2d 600, 606 (5th Cir.1983) ("We need not decide whether appellants were prejudiced by nondisclosure of the three oral statements because the government had no duty to disclose them.... There is no question that Cochran did not know McAnally was a government agent when they spoke on December 20 and 21. Cochran's statements thus do not come within the range of the rule."); *United States v. Burns,* 15 F.3d 211, 213-14 (1st Cir.1994) (same); *United States v. Verser,* 916 F.2d 1268, 1272 (7th Cir.1990) (same); *United States v. Presser,* 844 F.2d 1275, 1285 (6th Cir.1988) (same); *In re United States,* 834 F.2d 283, 284 (2d Cir.1987) (same); *United States v. Hoffman,* 794 F.2d 1429, 1432 (9th Cir.1986) (same); *United States v. McClure,* 734 F.2d 484, 493 (10th Cir.1984) (same); *United States v. Vitale,* 728 F.2d 1090, 1093-94 (8th Cir.1984) (same); *see also United States v. Kusek,* 844 F.2d 942, 948-49 (2d Cir.1988) ("Under this rule [Fed.R.Crim.P. 16(a)(1)(A) ], the government is not required to provide discovery of a defendant's unrecorded, spontaneous oral statements not made in response to interrogation."); *United States v. Cooper,* 800 F.2d 412, 416 (4th Cir.1986) (same). Thus, Bailey's statements to Agent Hudson were not discoverable under Rule 16 because Bailey did not know that Agent Hudson was a government agent. Significantly, Bailey knew before trial that Agent Hudson would be testifying about the USA906 pistol that Bailey offered to sell him at the gun show because this information was disclosed in Agent Hudson's application for the search executed on March 14, 1990. Furthermore, the note was introduced by the defense, not the government, and Bailey's counsel had elicited the statements in the note through a witness prior to Agent Hudson. Not only was Bailey's counsel not surprised by the statements in the note, but also Bailey did not

28

allege that he suffered any prejudice in the district court, and he does not identify any prejudice on appeal from the alleged late disclosure. *See Cochran,* 697 F.2d at 606 ("[W]e conclude that nondisclosure of both the erased tape and the three oral statements did not deprive [defendants-appellants] of their right to a fair trial."). Since Bailey has shown no prejudice to his substantial rights from the alleged late disclosure of the statements, no relief is warranted.

4. Alleged Misconduct in Closing Argument

Bailey asserts that the prosecutor's closing argument was improper because it characterized Bailey's defense as an attack on Agent Hudson, a responsible ATF agent, and invoked God, passages from the Bible, and John F. Kennedy in an effort to incite the passions of the jurors to find Bailey guilty. "The sole purpose of closing argument is to assist the jury in analyzing the evidence." *United States v. Iglesias,* 915 F.2d 1524, 1529 (11th Cir.1990). While a prosecutor may not exceed the evidence in closing argument, *id.,* he may state conclusions drawn from the evidence, *United States v. Johns,* 734 F.2d 657, 663 (11th Cir.1984). *See United States v. Nixon,* 918 F.2d 895, 905 (11th Cir.1990) (determining that the "prosecutor's statements were well within the government's discretion to urge a reasonable conclusion based on admitted evidence"). Although a prosecutor may not make an argument directed to passions or prejudices of the jurors instead of an understanding of the facts and law, *United States v. Tisdale,* 817 F.2d 1552, 1556 (11th Cir.1987) (per curiam), there is no prohibition on "colorful and perhaps flamboyant" remarks if they relate to the evidence adduced at trial, *United States v. Jacoby,* 955 F.2d 1527, 1541 (11th Cir.1992). For a claim of prosecutorial misconduct relating to the closing argument to be successful, the "argument must be improper and prejudicial to a substantial right of the defendant." *Iglesias,* 915 F.2d at 1529. A curative instruction, however, may render a prejudicial remark by the prosecutor harmless. *Id.* "Prosecutorial misconduct is a basis for reversing an appellant's conviction only if, in the context of the entire trial in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused." *United States v. Lopez,* 898 F.2d 1505, 1511 (11th Cir.1990).

When a defendant fails to object to the prosecutor's closing argument, relief is available to rectify only plain error that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial. *United States v. Rodgers,* 981 F.2d 497, 499 (11th Cir.1993) (per curiam);[25] *see* Fed.R.Crim.P. 52(b); *United States v. Young,* 470 U.S. 1, 14-15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (identifying plain errors as "those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings' " (citation omitted)). Because Bailey did not object to the prosecutor's closing argument at trial, our review is limited to plain error. "A prosecutor's comments [in closing argument] must be viewed in the context of the record as a whole, and will be the basis of reversal only if they result in prejudice affecting the substantial rights of the defendant." *United States v. Harmas,* 974 F.2d 1262, 1269 (11th Cir.1992); *see United States v. Frazier,* 944 F.2d 820, 825 (11th Cir.1991) (determining that analyzing a particular remark made by the prosecutor in closing argument for plain error is evaluated "against the entire record" and considering the preceding defense argument).

The prosecutor made two references to the Bible during his closing argument. First, preceding a detailed review of the evidence against Bailey, the prosecutor prefaced his argument concerning the mail fraud crimes by stating:

> Mr. Bailey forgot a very, very important concept in all of our lives from Luke 3:13, exact no more than that which is appointed you. Take no more from anyone which is not yours. But he couldn't live like that. He had to do more and take more. And that was how we moved into what happened with the police departments and the various victims before us.

R20-14-15. This reference merely served to emphasize the government's argument that Bailey was guilty of mail fraud. The prosecutor did not suggest that Bailey should be adjudicated under Biblical law, and he did not ask the jury to decide the case on an religious or emotional basis. This commentary was not improper when viewed in context of the detailed evidentiary review that immediately followed. *See Cape v. Francis,* 741 F.2d 1287, 1301 & n. 15 (11th Cir.1984)

---

[25]For a prosecutor's closing argument to violate due process, "the remarks must be improper and a reasonable probability must exist that, but for the offending remarks, the defendant would not have been convicted." *Rodgers,* 981 F.2d at 499.

(concluding that specific Biblical references, viewed in context, had no prejudicial effect on the jury).

Second, at the end of his rebuttal argument, the prosecutor again referred to the Bible and also to John F. Kennedy:

> I leave you with one last thought to help you with th[e] difficulties [of deciding this case]. It's a quote John Kennedy gave just shortly before he was inaugurated president, quoting Luke 12:24. And he said: For those to whom much is given, much is required. And when at some future date the high court of history sits in judgment of each of us, determining whether in our brief span of service we have fulfilled our obligations to the state, the answers to those questions will be determined by the responses to four questions: Are we truly men of dedication? Are we truly men of judgment? Are we truly men of integrity? And were we truly men of courage?
>
> Back in that jury room you have a difficult job to do. Walk back there and be men and women of dedication, judgment, integrity, and, most important, courage. Do what you have to do and then get on with the business of living.

R20-61. These comments merely reiterated and exhorted to the jurors their duty to obey their oaths and to decide the case with dedication, judgment, integrity, and courage. These remarks by the prosecutor were as likely to lead to an acquittal as a conviction. The prosecutor did not ask the jury to find Bailey guilty, he asked the jury to perform its civic duty, which was not prejudicial to Bailey.[26] *See United States v. Smith,* 918 F.2d 1551, 1562-63 (11th Cir.1990) (recognizing that prosecutorial appeals to the jury to act as the community conscience are permissible "when they are not intended to inflame").

Responding to allegations made by the defense about Agent Hudson's alleged perjury, the prosecutor argued:

> Ladies and gentlemen, let's bring this to the point: What defense counsel has done is to place an allegation on an agent of the United States, in this case Special Agent Chuck Hudson.

---

[26]When the prosecutor in a large marihuana distribution case exhorted the jury in closing argument to "please have the courage to go out there and find these Defendants guilty and come back and return guilty verdicts, because we need juries like yourselves that have the courage to do that," the Fifth Circuit decided that these remarks were permissible: "A fair reading of the closing argument confirms the accuracy of the district judge's ruling that the prosecutor made a vigorous, but permissible, plea for law enforcement. The offense charged is a major transaction, and the government committed no error in characterizing it as such." *United States v. Caballero,* 712 F.2d 126, 131, 132 (5th Cir.1983).

You have seen Agent Hudson, you have seen him testify. Do you think he lied? If you think he lied and perjured himself, ladies and gentlemen, let Bailey go, let him go. Because if you think he lied, ladies and gentlemen, the system just doesn't work anymore. It's just not worth the efforts involved. That's the most important fundamental thing throughout.

[Are] Agent Hudson's efforts to copy these tapes and ended up giving defense counsel more on the copying than was on the original tape and the copying over a lie? Or was it a mistake of a man doing his job[?]

Look at the tapes. He never punched out the back of the tapes to prevent erasure.

But if you think he lied, let Bailey go. And when you're making that decision, ask yourself what motive Agent Hudson would have to erase the tape of Martine Priest.

R20-40-41. These remarks were entirely appropriate to counter Bailey's central argument that Hudson had committed perjury. *See Smith,* 918 F.2d at 1562 (recognizing that the prosecutor is entitled to respond to characterizations from defense counsel). This argument by the prosecutor actually was beneficial to the defense because, although there was sufficient evidence for the jury to have convicted Bailey even if it had concluded that Agent Hudson testified untruthfully about the Priest tape, the prosecutor urged the jurors to acquit Bailey if they concluded that Agent Hudson had committed perjury.

Additionally, any possible prejudice to Bailey resulting from the prosecutor's closing argument was cured by instructions from the district judge that the lawyers' arguments were not evidence and that the jury was to decide the case solely on the evidence presented at trial.[27] *See*

---

[27]In relevant part, the district judge gave the jurors the following instructions concerning their consideration of the evidence and law as opposed to the attorneys' arguments:

It will be your duty to decide whether the government has proven beyond a reasonable doubt the specific facts necessary to find the defendant guilty of the crimes charged in the indictment.

*You must make your decision only on the basis of the testimony and the other evidence presented here during the trial.* And you must not be influenced in any way by either sympathy or prejudice for or against either the defendant or the government.

You must also follow the law as I explain it to you, whether you agree with that law or not. And you must follow all of the instructions as a whole. You should not single out or disregard any of the court's instructions on the law.

*Iglesias,* 915 F.2d at 1529.  The prosecutor's remarks in closing argument were legitimate commentary in context of the evidence against Bailey presented at trial and in response to Bailey's defense of attacking the credibility of Agent Hudson.  We conclude that the challenged remarks of the prosecutor do not rise to the level of plain error by seriously affecting the fairness and integrity of the trial.

D. *Sentence*

The government appeals Bailey's sentence because it was imposed under the November, 1989,[28] Sentencing Guidelines instead of the November, 1991, Sentencing Guidelines, the edition in effect when Bailey committed the last of his crimes.[29]  Bailey argues that the 1990 Sentencing

> The indictment, or the formal charge against the—against any defendant, is not evidence of guilt, as I have told you.  Indeed, a defendant is presumed by the law to be innocent.  The government has the burden of proving a defendant guilty beyond a reasonable doubt.  And if it fails to do so, you must find the defendant not guilty.
>
> ....
>
> As stated earlier, *you must consider only the evidence that I have admitted in the case.  The term evidence includes the testimony of the witnesses and the exhibits admitted in the record.*
>
> *Remember that anything the lawyers say is not evidence in the case.  It is your own recollection and your interpretation of the evidence that controls.  What the lawyers say is not binding on you.*

1 Supp. R16-26-27 (emphasis added).

[28]The government represents that Bailey was sentenced under the November, 1989, Sentencing Guidelines Manual.  Bailey states that he was sentenced under the 1990 Sentencing Guidelines Manual, and the transcript of the sentencing proceedings also shows that the district judge used the 1990 Sentencing Guidelines Manual for sentencing purposes.  Our review of the guidelines applied at Bailey's sentencing reveals that the government, Bailey, and the district judge all refer to the same edition of the Sentencing Guidelines Manual.  The Federal Sentencing Guidelines Manual, issued on November 1, 1989, states on its cover that it is the "1990 Edition." This version, used by the district judge to sentence Bailey, was effective until November 1, 1990, when the United States Sentencing Commission Guidelines Manual was issued.  Hereinafter, the "1990 Sentencing Guidelines" means the manual issued in November, 1989.

[29]Alternatively, the government contends that, even if the November, 1989, Sentencing Guidelines were the proper edition for Bailey's sentence, then that version of the Sentencing Guidelines was misapplied.  Specifically, the government argues that the district court committed prejudicial error by (1) sentencing Bailey, a licensed firearms dealer, under the gun

Guidelines was the proper version because it was the effective edition when he committed the majority or "heartland" of his crimes.[30] The district court agreed with Bailey and applied the 1990 Sentencing Guidelines. We review the district court's factual findings at sentencing for clear error, but we review its legal interpretations of the Sentencing Guidelines *de novo. United States v. Kirkland,* 985 F.2d 535, 537 (11th Cir.1993).

Generally, a convicted defendant's sentence is based on the United States Sentencing Commission Guidelines Manual "in effect on the date the defendant is sentenced." 18 U.S.C. § 3553(a)(4); U.S.S.G. § 1B1.11(a), p.s. (Nov.1992)[31]; *United States v. Lance,* 23 F.3d 343, 344 (11th

---

possession guideline, U.S.S.G. § 2K2.1 (Nov.1989), rather than the gun distribution guideline, *id.* § 2K2.2, and (2) applying U.S.S.G. § 2K2.1(b)(1), which reduces the base offense level from 16 to 6 "[i]f the defendant obtained or possessed the firearm or ammunition solely for lawful sporting purposes or collection," since Bailey did not possess his weapons solely for sporting purposes or collection but for sale. *See United States v. Skinner,* 968 F.2d 1154, 1156-57 (11th Cir.1992) (comparing lawful possession of firearms for a sporting purpose, hunting, with an unlawful reason, such as self-defense). The government also asserts that the district court committed plain error because it contravened the plain language of U.S.S.G. §§ 2K2.1(b)(1) and 2K2.1(c)(1). Finally, the government demonstrates that the district court's error affected the outcome of the proceedings because it determined the Sentencing Guidelines under which Bailey was sentenced. Although Bailey was sentenced to 10 to 16 months of imprisonment, his sentencing range under U.S.S.G. § 2K2.2 would have been 78 to 97 months of imprisonment, or approximately six years longer than it was. While we agree with the government that prejudicial and plain error was committed in applying the November, 1989, Sentencing Guidelines had they been the applicable version, we need not address this alternative argument because we are vacating Bailey's sentence for resentencing under the November, 1991, Sentencing Guidelines.

[30]Bailey derived his heartland theory from the date of the concentration of the crimes of which he was convicted. Bailey was convicted of ten counts or instances of mail fraud that occurred from March 3, 1989, through December 19, 1991; one count of dealing in firearms without a license that occurred on March 3, 1989; four counts of illegal possession of machineguns, three of which occurred on March 14, 1990, and one of which occurred on April 15, 1992; two counts of illegal possession of a destructive device, both of which occurred on March 14, 1990; one count of making a false statement to the grand jury, which occurred on February 14, 1991; and one count of obstruction of investigation, which occurred beginning on March 25, 1992, and continued into April, 1992. Thus, he argued and convinced the district court that March 14, 1990, the date of the most counts of his conviction, was the date on which to base the Sentencing Guidelines Manual used to sentence him.

[31]"The principle that the Guidelines Manual is binding on federal courts applies as well to policy statements." *Stinson v. United States,* 508 U.S. 36, 42, 113 S.Ct. 1913, 1917, 123 L.Ed.2d 598 (1993); *see Williams v. United States,* 503 U.S. 193, 200-01, 112 S.Ct. 1112, 1119, 117 L.Ed.2d 341 (1992) (establishing that a Sentencing Guidelines policy statement is an authoritative interpretive guide to the meaning of an applicable guideline).

Cir.1994) (per curiam). If the effective Sentencing Guidelines Manual on the date of sentencing violates the *Ex Post Facto* Clause[32] of the United States Constitution, then the district judge must use the Sentencing Guidelines Manual that was in effect on the date that the crime was committed. U.S.S.G. § 1B1.11(b)(1), p.s. (Nov.1992); *Lance,* 23 F.3d at 344. The use of either the Sentencing Guidelines Manual in effect at sentencing or the one in effect when the crime was committed is known as the "one book rule."[33] *See United States v. Corrado,* 53 F.3d 620, 623 (3d Cir.1995) ("The practice of applying only one version of the guidelines when calculating a defendant's sentence has been referred to as the "one book rule.' "); *see also Lance,* 23 F.3d at 344 (acknowledging that other circuits adhere to the one book rule and applying that rule). "This [one book] rule requires that a single Guidelines Manual govern a defendant's sentencing calculation in its entirety." *United States*

---

[32]The *Ex Post Facto* Clause, U.S. Const. art. I, § 9, cl. 3, "forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred." *Weaver v. Graham,* 450 U.S. 24, 30, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981). Additionally, a sentencing scheme violates this constitutional ban if it is enacted after the commission of the crime and before sentencing, and its application results in a more onerous penalty. *See Miller v. Florida,* 482 U.S. 423, 431-33, 107 S.Ct. 2446, 2451-52, 96 L.Ed.2d 351 (1987).

[33]The 1992 amendments to the Sentencing Guidelines Manual codified the one book rule and required its application for Guidelines sentences after the 1992 amendments:

> The Guidelines Manual in effect on a particular date shall be applied in its entirety. The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and another guideline section from a different edition of the Guidelines Manual. However, if a court applies an earlier edition of the Guidelines Manual, the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes.

U.S.S.G. § 1B1.11(b)(2), p.s. *See United States v. Springer,* 28 F.3d 236, 237 (1st Cir.1994) ("This provision instructs the district court that when it looks to an earlier version of the Guidelines to calculate a sentence, it must apply *all* of the Guidelines in that earlier version."); *see also* U.S.S.G. § 1B1.11, comment. (backg'd) (Nov.1993) ("[E]ven in a complex case involving multiple counts that occurred under several different versions of the Guidelines Manual, it will not be necessary to compare more than two manuals to determine the applicable guideline range—the manual in effect at the time the last offense of conviction was completed and the manual in effect at the time of sentencing."); *United States v. Camacho,* 40 F.3d 349, 354 (11th Cir.1994) ("Clarifying amendments are amendments to the commentary of the sentencing guidelines, and are considered by this court in interpreting the guidelines, even when the defendant was sentenced before the effective date of the amendments."), *cert. denied,* 514 U.S. 1090, 115 S.Ct. 1810, 131 L.Ed.2d 735 (1995).

*v. Nelson,* 36 F.3d 1001, 1004 (10th Cir.1994). This court has recognized that the application of different versions of the Sentencing Guidelines Manual would contravene the sentencing uniformity objective of the Sentencing Commission, which intended that the Guidelines be applied "as a cohesive whole" and not "in a piecemeal fashion" so that a defendant cannot "mix and match amended provisions" to achieve a more favorable sentence. *Lance,* 23 F.3d at 344; *see United States v. Keller,* 58 F.3d 884, 890 (2d Cir.1995) ("A version of the sentencing guidelines is to be applied in its entirety. A sentencing court has no authority to pick and choose, taking one provision from an earlier version of the guidelines and another from a later version.... [The one book rule] avoid[s] twisting the guidelines, depriving them of uniformity and consistency."). Consequently, "when *ex post facto* clause issues arise, while the one-book rule cannot apply to compel application of the *later* Manual to all counts, it certainly can compel application of the earlier Manual." *United States v. Bertoli,* 40 F.3d 1384, 1404 n. 17 (3d Cir.1994).

Additionally, the one book rule, together with the Guidelines grouping rules[34] and relevant

conduct,[35] provide that related offenses committed in a series will be sentenced together under the

---

[34]The Guidelines grouping rules for closely related counts provide as follows:

> All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
>
> (a) When counts involve the same victim and the same act or transaction.
>
> (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
>
> (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.
>
> (d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

U.S.S.G. § 3D1.2 (Nov.1991).

> The commentary to this guideline states that "[s]ubsections (a)-(d) set forth circumstances in which counts are to be grouped together into a single Group. Counts are to be grouped together into a single Group if any one or more of the subsections provide for such grouping." *Id.* comment. (n.1). The commentary also explains that "[s]ubsection (d) likely will be used with the greatest frequency. It provides that most property crimes ..., drug offenses, *firearms offenses,* and other crimes where the guidelines are based primarily on quantity or *contemplate continuing behavior are to be grouped together." Id.* comment. (n.6) (emphasis added). Specific grouping examples include conviction for five counts of mail fraud and ten counts of wire fraud. *Id.* "Although the counts arise from various schemes, *each involves a monetary objective.* All fifteen counts are to be grouped together." *Id.* (emphasis added). Similarly, conviction for three counts of unlicensed dealing in firearms requires that "[a]ll three counts are to be grouped together." *Id.* Furthermore, "[a] single case may result in application of several of the rules in this [grouping] section." *Id.* comment. (n.7).

[35]The Guidelines provide for consideration of relevant conduct, consisting of "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ... solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivision[ ] (1)(A) ... above that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(1)(A), (2) (Nov.1992). The commentary explains that " '[c]ommon scheme or plan' and 'same course of conduct' are two closely-related concepts." *Id.* comment. (n.9).

37

Sentencing Guidelines Manual in effect at the end of the series. Thus, a defendant knows, when he continues to commit related crimes, that he risks sentencing for all of his offenses under the latest, amended Sentencing Guidelines Manual. Analogous to a continuous criminal offense, like conspiracy, the one book rule provides notice that otherwise discrete criminal acts will be sentenced together under the Guidelines in effect at the time of the last of those acts. In a similar case, the Eighth Circuit upheld the one book rule in the prosecution of a defendant for possession of three firearms on three different occasions because the offenses all were integral to the operation of his firearms business. *United States v. Cooper,* 35 F.3d 1248 (8th Cir.1994), *vacated,* 514 U.S. 1094, 115 S.Ct. 1820, 131 L.Ed.2d 742, *reinstated,* 63 F.3d 761 (8th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1548, 134 L.Ed.2d 650 (1996).

Bailey committed his crimes between February, 1989, and April, 1992. He was sentenced on March 4, 1994. The government conceded that application of the November, 1993, Sentencing Guidelines Manual, the edition in effect at Bailey's sentencing, would violate the *Ex Post Facto* Clause. R21-11-12. Consequently, the government argued that Bailey should have been sentenced under the November, 1991 Sentencing Guidelines Manual, the edition in effect when he committed

---

(A) *Common scheme or plan.* For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, *common purpose,* or similar *modus operandi. ...*

(B) *Same course of conduct.* Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or *ongoing series of offenses.* Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the *degree* of similarity of the offenses and the *time interval between the offenses.* The *nature of the offenses* may also be a relevant consideration....

*Id.* comment. (n.9(A),(B)) (emphasis added); *see United States v. Cooper,* 35 F.3d 1248, 1251 n. 4 (8th Cir.1994) ("[T]he 1992 amendments to the Guidelines clarified the definitions of "common scheme or plan' and "same course of conduct.' "), *vacated,* 514 U.S. 1094, 115 S.Ct. 1820, 131 L.Ed.2d 742, *reinstated,* 63 F.3d 761 (8th Cir.1995), *cert. denied,* --- U.S. ----, 116 S.Ct. 1548, 134 L.Ed.2d 650 (1996).

the last of his crimes. Bailey's counsel persuaded the district court to sentence Bailey under the 1990 Sentencing Guidelines Manual, allegedly the edition in effect when he committed the majority of his crimes, or the "heart of the misconduct in issue."[36] Appellant-Cross Appellee's Reply and Response Brief at 24. The government objected to the use of the 1990 Sentencing Guidelines Manual. R22-33-34.

On cross appeal, Bailey admits that the 1993 Sentencing Guidelines Manual in effect at the time of his sentencing would have resulted in a harsher sentence than the Sentencing Guidelines

---

[36]At the sentencing proceeding, Bailey's counsel explained his "heartland" theory concerning an *ex post facto* problem in applying the Sentencing Guidelines:

> What we have here are multiple offenses and varied offenses. The courts are instructed to find the heartland of the offense. The guidelines are incapable of being found on what kind—what effect a subsequent offense of one kind has on earlier offenses. And that's what brings into effect the ex post facto issue.
>
> Here, if you wanted to—if this were an earthquake, where would the epicenter be? It would be March 14th, 1990. There was behavior behind that—beyond that, but where was the heartland, where is the gravamen of this offense? It is March the 14th of 1990.
>
> The fact that a firearms offense which is unrelated to the fraud, to the heartland, occurred in 1992 does not take the entire offense of grouped offenses over into the 1992 guidelines. And the commentary doesn't indicate that. And there are no instructions on what to do with it. A rule of lenity should apply and the court should impose the least harsh guideline period.

R22-26-27. Understandably, the district judge initially questioned this novel theory: "I have seen the term heartland applied to a departure situation where the offense is outside the heartland of the matters considered by the Sentencing Commission in constructing the offense structure. I have not seen the heartland terminology applied to the ex post facto line of cases." *Id.* at 28. Nevertheless, the district judge ultimately was convinced by this innovative reasoning:

> [T]he heartland of these offenses is in fact in 1989 and 1990. The difference in the penalties is shocking.
>
> And if there is a case with ex post facto considerations in a multiple count complaint with multiple offenses, this ought to be it. And it seems to me that this is it. And if the authorities disagree, then this may yet be it. But at least for the moment, I'm going to go ahead and apply the 1990 Sentencing Guidelines.

*Id.* at 33.

Manual in effect when he committed the crimes for which he was convicted.[37] Since both the government and Bailey acknowledged that his sentence under the effective Sentencing Guidelines Manual at the time of his sentencing implicated the *Ex Post Facto* Clause, the correct version of the Sentencing Guidelines Manual, under the one book rule of U.S.S.G. § 1B1.11(b)(1), p.s. (Nov.1992), was the November, 1991 edition, the version in effect in April, 1992, when Bailey committed the last crime for which he was convicted with the application of the relevant conduct provision for his related, previous crimes. *See Cooper,* 35 F.3d at 1251 ("[W]ith conspiracy and other continuing offenses it is the completion date of the offense that controls the version of the Sentencing Guidelines to be applied."). Bailey's offenses clearly composed a single Guidelines group because, as in *Cooper,* all of his crimes were integrally related to his ongoing purpose of deriving money from the operation of his firearms business. Significantly, sentencing Bailey under the Sentencing Guidelines Manual in effect when he committed his crimes afforded him " "fair warning' " of the punishment for his crimes, a concern central to the *ex post facto* prohibition.[38]

---

[37]Bailey's brief on the cross appeal addresses and specifies the *ex post facto* problem that would have resulted if he had been sentenced under the 1993 Sentencing Guidelines Manual in effect at the time of his sentencing:

> The Guidelines between the years of 1990 and 1993 changed substantially the penalties for possession of automatic weapons. In the instant matter, if the court had followed the Guidelines in effect at the time of sentencing, the defendant's sentence would have been a substantially harsher one. As the court noted, the difference in the punishment between the Guidelines in effect at the time of the misconduct and the Guidelines in effect at the time of sentencing was substantial; it was a difference of either sentencing the defendant to time served or to 12 years. (R22-30). The district court recognized the constitutional concerns and applied the Guidelines in effect on the date of the misconduct, the ... 1990 Guidelines Manual (R22-20, 30, 32-33).

Appellant-Cross Appellee's Reply and Response Brief at 25.

[38]Although Bailey could not have predicted the one book rule, which was issued in the 1992 Sentencing Guidelines Manual after the commission of the last of the crimes for which he was convicted, § 1B1.11(b)(1), p.s. is a clarifying amendment rather than an substantive one and should have been considered by the sentencing judge at Bailey's sentencing on March 4, 1994. *See* U.S.S.G. § 1B1.11(b)(2). Importantly, the *Ex Post Facto* Clause will not be implicated because Bailey will be sentenced by the effective Sentencing Guidelines Manual when he committed the last of the crimes for which he is being punished. *See Springer,* 28 F.3d at 238 ("[T]he district court imposed the very punishment provided for by law at the time [the

*Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987); *see Weaver,* 450 U.S. at 31, 101 S.Ct. at 965 ("Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice...."); *Zeigler v. Alabama,* 731 F.2d 737, 739 (11th Cir.1984) ("The purpose of the *ex post facto* prohibition is to ensure notice of the illegality prior to attaching criminal sanctions.").

As the Eighth Circuit explained in *Cooper:*

> In our view, [the defendant] had fair warning that commission of the January 23, 1992, firearm crime was governed by the 1991 amendments that provided for increased offense levels and new grouping rules that considered the aggregate amount of harm. Utilizing the *Miller* analysis, *it was not the amendments to the Sentencing Guidelines that disadvantaged [the defendant], it was his election to continue his criminal activity after the 1991 amendments became effective. [The defendant] could have easily avoided coming under the amended Sentencing Guidelines by desisting in his repeated criminal possession of firearms prior to November 1, 1991.*

*Cooper,* 35 F.3d at 1250 (emphasis added). Consequently, we reject Bailey's heartland theory relating to a sentence that involves an *ex post facto* problem.[39] We conclude that Bailey had fair

---

defendant] committed the act for which he was being punished."); *see also Corrado,* 53 F.3d at 625 ("[T]he impossibility of prognostication under these circumstances is not at all analogous to "the lack of fair notice' which, from the outset, has been recognized as central to the *ex post facto* prohibition." (quoting *Miller,* 482 U.S. at 430, 107 S.Ct. 2451)).

[39]In addition to being in violation of the one book rule as we have explained, the heartland method of calculating a defendant's sentence, urged by Bailey and used by the district judge, creates a severe sentencing anomaly that results in a defendant receiving a lower sentence for committing more crimes. *See* U.S.S.G. § 1B1.11, comment. (backg'd) (Nov.1993) (noting this anomaly); *United States v. Hartzog,* 983 F.2d 604, 608 n. 6 (4th Cir.1993) (same). In this case, Bailey was convicted on three counts (Counts XV-XVII) of possessing a machinegun on March 14, 1990, and one count (Count XVIII) of possessing a machinegun on April 15, 1992. Using Bailey's heartland theory, the district judge sentenced him under the 1990 Sentencing Guidelines Manual because three of the four convictions were under those Sentencing Guidelines. Bailey's sentence for all four convictions was 10 to 16 months of imprisonment. If Bailey had been convicted on Count XVIII only, then the district judge would have applied the 1991 Sentencing Guidelines Manual because Count XVIII involved a crime committed after November, 1991. Nevertheless, the district judge would have considered *all* of the guns involved in the case as relevant conduct under U.S.S.G. § 1B1.3. *See, e.g., United States v. Partington,* 21 F.3d 714, 718-19 (6th Cir.1994); *United States v. Collins,* 957 F.2d 72, 78 (2d Cir.1992); *United States v. Dennis,* 926 F.2d 768, 769 (8th Cir.1991) (per curiam). Thus, Bailey's sentencing range for Count XVIII alone would have been 121 to 151 months of imprisonment, the sentencing range that the government urges. In contrast, with the district court's heartland approach, Bailey actually received a lower sentence for committing more crimes. That result is in contravention of the policy and intent of the Sentencing Guidelines, and the *Ex Post Facto* Clause does not require it.

notice that continuing his crimes in operating his firearms business subjected him to the amended Sentencing Guidelines in effect when he committed the last of the crimes for which he was convicted. On remand, the district court will resentence Bailey under the 1991 Sentencing Guidelines Manual.

## III. CONCLUSION

Bailey appeals his conviction on the bases of sufficiency of the evidence, constitutionality of 18 U.S.C. § 922(*o*), and prosecutorial misconduct. The government cross appeals that Bailey should have been sentenced under the 1991 Sentencing Guidelines Manual, and we agree. As we have explained herein, Bailey's conviction is AFFIRMED. His sentence is VACATED, and we REMAND this case to the district court to resentence Bailey under the 1991 Sentencing Guidelines Manual in accordance with the one book rule.