[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 29, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12385
Non-Argument Calendar
_____

D. C. Docket No. 04-00185-CR-T-24-TBM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ZANDRINA ALEXANDER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(March 29, 2007)

Before BIRCH, WILSON and PRYOR, Circuit Judges.

PER CURIAM:

Zandrina Alexander, following a jury trial, appeals her conviction of

presenting false claims against the government in violation of 18 U.S.C. § 287. She argues that numerous evidentiary errors occurred during her trial, and require reversal. Because we find no error, we AFFIRM her conviction.

## I. BACKGROUND

In 1998, the Department of Health and Human Services ("HHS") received a tip from a whistleblower that Delellis Promotions, Inc. ("DPI"), and its owner, Christine Delellis, were engaged in Medicare fraud. DPI's business involved supplying durable medical equipment ("DME") to Medicare patients, and submitting claims for reimbursement through the Medicare program. The whistle blower alleged, among other things, that DPI and Delellis submitted fraudulent requests for reimbursement and paid illegal monetary kickbacks for Medicare patient referrals.

In response to the allegations, HHS began an investigation of DPI and Delellis. In connection therewith, another DME supplier who was acquainted with Delellis, Faith Fairbrother volunteered to act as an informant. Fairbrother agreed to have recording devices installed on her home telephone and to meet with Delellis while wearing a body wire. During the in-person meeting with Delellis, Fairbrother was accompanied by Angela David, a government investigator posing as a discharge case manager for a hospital, going by the name Angela Renea.

2

Fairbrother and David were also assisted by Kyle Ford, a special agent with HHS.

The investigation began with Fairbrother alerting Delellis that David had a Medicare patient named Paul Watson who was set to be released from the hospital and was in need of a mechanized wheelchair, but his physician was reluctant to prescribe one. In fact, Watson was a fictitious beneficiary created by HHS. In support of the investigation, HHS issued Medicare documentation in Watson's name.

According to tape recorded conversations, Delellis told Fairbrother that she should talk to Watson's doctor, but if he continued to refuse to prescribe Watson a mechanical wheelchair, Delellis could arrange to have a doctor sign for one. In a later conversation, after Fairbrother told Delellis that Watson's doctor would not cooperate, Delellis said, "I can get the CMN signed, that's not a problem . . . I'll just . . . have the doc sign it and give her a couple bucks." R4 at 249. When asked who the prescribing doctor would be, Delellis indicated that she would probably ask Alexander, a female internist. Delellis later informed Fairbrother that the doctor had agreed to sign for a motorized wheelchair and that Delellis would compensate her for the signature. After the wheelchair was delivered, Delellis informed Fairbrother that she had paid the doctor and that she would file the claim with Medicare because she had obtained the doctor's signature. DPI subsequently

3

submitted an electronic CMN for reimbursement for the Watson wheelchair, identifying Alexander as the referring physician.

After DPI filed for reimbursement for the wheelchair, the government obtained and executed a search warrant on DPI, recovering numerous CMNs from DPI's files. Ford testified that while conducting the search, Delellis informed him that she had improperly completed portions of the CMN and acknowledged that she had never met Watson. Ford also later interviewed Alexander, and testified that Alexander stated "yes, that is my signature" in reference to the Watson CMN. R6 at 272.

At trial, Ford testified regarding DPI's bank records and discussed two specific transactions. Video footage confirmed that in the course of one of the in-person meetings between Fairbrother, David, and Delellis, Delellis paid $100 in cash to David for referring a patient. Bank records indicated that a withdrawal of a similar amount was made from DPI's account in temporal and physical proximity to the meeting at a restaurant. Ford also testified that on the same day in which tape recordings captured Delellis informing Fairbrother that she had paid the doctor, a withdrawal was made from DPI's bank account at an ATM near Alexander's office.

After hearing from all its witnesses at trial, the government recalled Ford to

4

summarize the evidence and introduced two summary exhibits. At sidebar, Alexander's counsel objected that the diagram drew an inference that Delellis had paid Alexander and asked "for a – some type of instruction that it's being entered . . . based on . . . the government's theory." R7 at 184. Alexander also objected before the jury that the diagram "shows that Dr. Alexander actually received the money and, uh, I think that is a question for the jury." Id. at 186. The court overruled her objections and notified the jury that it "might have an instruction for the jury at some point." Id. After the second summary exhibit was admitted, and again during final instructions, the court informed the jury that it had received the exhibits into evidence as summaries of voluminous writings, documents, and records and the summaries would be available during deliberation.

During its closing remarks, the government made statements to the jury that Alexander now argues were improper. Alexander contends that the government made direct appeals to the passions of the jury, and improperly attempted to shift the burden of proof to the defendant.

On appeal, Alexander raises the following issues: (1) the court improperly admitted into evidence tape recordings of out-of-court statements made by Delellis, and publication of the statements to the jury violated Alexander's rights under the Confrontation and Due Process Clauses, (2) out-of-court statements made by

5

Delellis to Ford were improperly admitted into evidence and publication of the statements to the jury violated Alexander's rights under the Confrontation and Due Process Clauses, (3) the court improperly admitted into evidence the summary diagram prepared by Ford, (5) the government made improper closing arguments, and (5) cumulative error requires that the verdict be set aside.

## II.  DISCUSSION

We review evidentiary rulings for an abuse of discretion.  United States v. Baker, 432 F.3d 1189, 1202 (11th Cir. 2005), cert. denied, __ U.S. __, 126 S. Ct. 1809 (2006).  A district court commits an abuse of discretion where its "decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact."  Id.  Further, we review preserved evidentiary objections under the harmless error standard, while we review evidentiary objections raised for the first time on appeal for plain error only.  Id.  Under the plain error standard of review, we may not correct an error not raised at trial unless there is "(1) error, (2) that is plain, and (3) that affects substantial rights.  If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Id.  at 1202-03.  After examining the individual allegations of evidentiary errors, we must review the

6

errors in the aggregate, and should "reverse if the cumulative effect of the errors is prejudicial, even if the prejudice caused by each individual error was harmless." Id. at 1203.

A. Tape Recorded Statements

Alexander argues that the court erred by admitting tape recordings under Federal Rule of Evidence 801(d)(2)(E), the co-conspirator exception to the hearsay rule. She contends that the government did not meet its burden of proving by a preponderance of the evidence that the underlying factual predicates of Rule 801(d)(2)(E) were present. See United States v. Underwood, 446 F.3d 1340, 1345-46 (11th Cir.), cert. denied, __ U.S. __, 127 S. Ct. 225 (2006) (citation omitted). She further argues that, even if the requirements of Rule 801(d)(2)(E) were met, admission of the statements violated her constitutional rights under the Due Process and Confrontation Clauses. Alexander also urges us to hold that the application of Rule 801(d)(2)(E) turns on the existence of an agency relationship between the declarant and the defendant, and that because such a relationship was absent here, the admission of Delellis's statements was improper. Finally, Alexander contests the admission of the tapes in their entirety on the ground that the tapes included prejudicial statements irrelevant to her case. We address these arguments in turn.

1. Requirements of Federal Rule of Evidence 801(d)(2)(E)

In order to introduce the tape recordings of Delellis as co-conspirator statements, the government was first required "to prove by a preponderance of the evidence that (1) a conspiracy existed, (2) the conspiracy included the declarant and the defendant against whom the statement [was] offered, and (3) the statement was made during the course of and in furtherance of the conspiracy." Id. (citation omitted). We review for clear error the district court's determination that these factual requirements were satisfied. United States v. Matthews, 431 F.3d 1296, 1308 (11th Cir.) (per curiam), cert. denied, __ U.S. __, 127 S. Ct. 46 (2006).[1]

Alexander argues that the government failed to adduce sufficient evidence to prove the existence of a conspiracy by a preponderance of the evidence. We disagree. In assessing whether the government has shown the existence of a conspiracy, the contents of the statement at issue are not alone sufficient to prove the existence of a conspiracy, but are to be considered by the district court. Fed R. Evid. 801(d)(2)(E); see also United States v. Diaz, 248 F.3d 1065, 1087 n.22 (11th Cir. 2001). Here, the disputed tape recordings contained statements by Delellis that Alexander was "a friend of [hers]" who would be willing to sign a CMN for a

---

[1] Although the district court did not make explicit findings on this threshold issue, by admitting the controverted statements, the court implicitly found that the statements had been made "in the course of, and in furtherance of, a conspiracy." See United States v. Miles, 290 F.3d 1341, 1352 (11th Cir. 2002) (per curiam).

patient without first treating that patient. R4 at 259. The recordings also contain statements by Delellis that Alexander was "fantastic," had been "very good to [Delellis]," and was "one of [Delellis's] biggest referral sources." Id. at 267-68. The district court properly considered this evidence in determining whether the government proved a conspiracy.

Moreover, evidence independent of the disputed recordings included an electronic claim form for a wheelchair for the fictitious patient Paul Watson, submitted by DPI, and identifying Alexander as the referring physician. The evidence also included a hard copy of the CMN for Paul Watson, containing Delellis's handwriting in Section B and Alexander's signature, as well as Ford's testimony that Alexander stated "yes, that is my signature," when shown Watson's CMN. R6 at 272. The district court did not clearly err in finding this evidence sufficient to establish the existence of a conspiracy by a preponderance of the evidence.

Alexander also argues that, at best, the government established the existence of two separate conspiracies, and that Delellis's recorded statements to Fairbrother were in furtherance of a conspiracy in which Alexander did not take part. Alexander contends that if she was involved in a conspiracy at all, the conspiracy was only between Alexander and Delellis, and involved Alexander signing CMNs

9

for patients she had not treated.  Meanwhile, she contends that Delellis was engaged in a separate conspiracy with Fairbrother and David, whereby Alexander would pay Fairbrother and David kickbacks for patient referrals.  Alexander claims she was unaware of the kickback scheme among Delellis, Fairbrother, and David, and that statements made in furtherance of that separate conspiracy could not properly be introduced against Alexander under Rule 801(d)(2)(E).

The district court did not clearly err in finding that Alexander, Delellis, Fairbrother, and David were involved in a single conspiracy.  Alexander could not have signed CMNs for Watson and other fictitious patients had Fairbrother and David not referred those patients to Delellis.  Likewise, the patient referrals Delellis received from Fairbrother and David were worthless without a physician who was willing to sign CMNs.  "Because [Alexander's] acts facilitated the entire scheme, a single conspiracy was shown."  See United States v. Woodward, 459 F.3d 1078, 1085 (11th Cir. 2006) (per curiam).  Thus, at least with respect to the portions of the recordings played in court, the requirements of Rule 801(d)(2)(E) were satisfied.[2]

2.  Due Process and Confrontation Clauses

Alexander argues that, even if the requirements of Rule 801(d)(2)(E) were

---

[2] We address subsequently the portions of the recordings not played in court, but made available to the jury.

10

met, admission of Delellis's tape-recorded statements violated her rights under the due process and confrontation clauses of the constitution. Alexander contends that Delellis's statements were testimonial evidence, and because Delellis had not been subjected to cross-examination, and was not unavailable to testify, the statements were inadmissible. See Crawford v. Washington, 541 U.S. 36, 68, 124 S. Ct. 1354, 1374 (2004) ("Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). She further argues that, even if the statements were not testimonial in nature, they were nonetheless so unreliable as to violate her due process and confrontation rights. These arguments fail.

As Alexander acknowledges in her brief, we held in Underwood that statements made to an undercover informant in the course of an investigation are non-testimonial, because the statements "clearly were not made under circumstances which would have led [the declarant] to believe that his statement would be available for use at a later trial." 446 F.3d at 1347. Delellis's statements that were introduced at trial were made to an undercover informant, Fairbrother, and an investigator, David. As such, pursuant to our holding in Underwood, those statements were not testimonial. See id. Because the statements were non-testimonial and satisfied the requirements for admissibility of co-conspirator

11

statements they were properly admitted. See id. at 1347-48.

Alexander points out that the government characterized Delellis as "deceptive" and "not credible," R7 at 18-19, and argues that Delellis believed she could mitigate her own potential liability by implicating Alexander, rendering her statements inherently unreliable. The Supreme Court, however, has stated that "the co-conspirator exception to the hearsay rule is firmly enough rooted in our jurisprudence that . . . a court need not independently inquire into the reliability of such statements." Bourjaily v. United States, 483 U.S. 171, 183, 107 S. Ct. 2775, 2782 (1987) (citation omitted). Because the statements at issue qualify as co-conspirator statements, we hold that their admission did not violate Alexander's rights under the due process and confrontation clauses.

3.  Lack of Agency Relationship

Alexander also argues that Delellis's out-of-court statements should not have been admitted because Delellis was not speaking as an agent or representative of Alexander, and because Delellis's interests did not coincide with Alexander's interests. Alexander cites no case in which we have held that the co-conspirator exception turns on the existence of an agency relationship between the declarant and the defendant, and we decline to create such a rule. Accordingly, we reject this argument.

12

4. Admission of Tapes in Their Entirety

We next turn to Alexander's argument that the district court erred in admitting in their entirety the government's undercover recordings of Delellis. Alexander identifies several portions of the tapes that she believes were both irrelevant and prejudicial. Specifically, she contests the admission of portions of the tapes in which Delellis is heard discussing dealings with doctors other than Alexander involving unrelated conduct, describing a scheme wherein Delellis would buy back equipment and then sell it for a profit, and explaining how she had lied in order to help a friend get a job. Alexander argues that these statements were not in furtherance of the conspiracy at issue, and were prejudicial in that they showed Alexander's association with a "bad woman."

We first note that under circuit precedent, these statements may qualify as co-conspirator statements. Even if the conduct discussed was not directly related to the conduct in which Alexander was involved, the statements may have been in furtherance of the conspiracy if they were "used to obtain the confidence or to allay the suspicions of a co-conspirator." See United States v. Santiago, 837 F.2d 1545, 1549 (11th Cir. 1988). We need not decide whether they were in furtherance of the conspiracy, however, because even if the contested statements were erroneously admitted, they would not warrant reversal. See United States v. Arbolaez, 450

13

F.3d 1283, 1290 (11th Cir. 2006) (per curiam) ("To require a new trial a significant possibility must exist that, considering the other evidence presented by both the prosecution and the defense, the statement had a substantial impact upon the verdict of the jury.") (citation, quotation, and formatting omitted). We believe that any error in admitting the disputed portions of the tapes was harmless, and did not have a substantial influence on the outcome of the trial.

The evidence Alexander complains of showed that Delellis participated in similar schemes with numerous doctors, and that she was a dishonest person. Yet the properly admitted evidence of the conspiracy involving Alexander demonstrates those same qualities in Delellis. Thus, we do not find the admission of the complained-of statements prejudicial.

5. Reliability of Recordings

Alexander also argues that the tapes and transcripts failed to meet the standards for authenticity because portions of the tapes were unintelligible and the transcripts contained errors or inaccuracies. We have stated that "[i]t is well settled law that the party introducing a tape into evidence has the burden of going forward with sufficient evidence to show that the recording is an accurate reproduction of the conversation recorded." United States v. Sarro, 742 F.2d 1286, 1292 (11th Cir. 1984). A tape recorded in poor quality or containing inaudible or unintelligible

14

portions is admissible unless the trial judge, in his sound discretion, determines that "the inaudible or unintelligible portions 'are so substantial as to render the recording as a whole untrustworthy.'" United States v. Pope, 132 F.3d 684, 688 (11th Cir. 1998) (citation omitted). As for the transcripts prepared from the recording, we have held that "[a] district court need not find that the transcript is perfectly accurate prior to its admission, and a defendant's remedy for alleged inaccuracies is to offer his own transcript with proof as to why it is a better one." United States v. Hogan, 986 F.2d 1364, 1376 (11th Cir. 1993).

The government met its burden of authenticity. Prior to the government introducing the tapes into evidence, Fairbrother, a participant in all recorded conversations, testified that they were the same tapes she had listened to in their entirety, that she recognized the voices on the tapes, and that the tapes accurately depicted what transpired during the conversations. The government later elicited similar testimony from Ford with respect to the conversations involving him. The district court, in its discretion, determined that the inaudible or unintelligible portions were not "so substantial as to render the recording as a whole untrustworthy." See Pope, 132 F.3d at 688 (citation omitted). Though Alexander identifies several portions of the transcripts marked "unintelligible," the majority of the excerpts of the tapes played at trial appear from the record to have been

15

intelligible, and the district court did not abuse its discretion by admitting the recordings. Moreover, Alexander did not contest the accuracy or provide an alternate version of the transcripts at trial, and, therefore, cannot now challenge their reliability.

B. Delellis's Statements to Agent Ford

When Ford executed the search warrant at DPI, Ford questioned Delellis about CMNs that he found on the premises. In response, Delellis stated that she had completed Section B of the CMN for Watson's wheelchair, and that she knew what she had done was wrong, because she did not know Watson. She also stated that she could not identify some of the handwriting on the CMN. Alexander contends, and the government concedes, that the district court erred in admitting these statements at trial. The government, however, argues that the error was harmless.[3]

We agree with the government that the admission of Delellis's statements to Ford was, at most, harmless error. As the government points out, the jury heard testimony from Angeline Rober, Delellis's office manger, that Delellis had completed Section B of CMNs that bore Alexander's signature, including the

_____

[3] The government further argues that, because Alexander only raised a hearsay objection at trial, we must apply the plain-error standard of review to Alexander's claims of constitutional error. We need not address the issue, however, because even under harmless error analysis, Alexander's argument fails.

16

Watson CMN. Indeed, the key evidence as to the count of conviction consisted of the Watson CMN, apparently signed by Alexander, and properly admitted testimony that Alexander acknowledged the signature as her own. Delellis's statements to Ford added nothing to this crucial evidence, and accordingly, did not have a substantial influence on the jury's verdict. See United States v. Williams, 445 F.3d 1302, 1307 n.4 (11th Cir. 2006) (finding that any error in admitting evidence was harmless, as the properly admitted evidence "provided ample support for every crime of which [the defendant] was convicted").

C. The Diagram

The district court admitted into evidence a diagram, prepared by the government, that purported to summarize the evidence relating to Count V, the only count of which Alexander was ultimately convicted. The diagram contained a chart that, in part, showed a CMN for Watson flowing from Alexander to Delellis, and $150 flowing from Delellis to Alexander. Alexander argues that the chart was inadmissible under Federal Rule of Evidence 1006, and moreover, that it was prejudicial, in that it merely depicted the government's theory of the case, and, by showing Alexander receiving a monetary kickback, assumed Alexander's guilt.

We need not decide whether the diagram was admitted in error, because to the extent it was, that error was harmless. Alexander was convicted of presenting

17

false claims against the government under 18 U.S.C. § 287, and the receipt of a kickback is not an element of that offense. Thus, the diagram's depiction of Alexander accepting payment from Delellis was not relevant to her conviction. Indeed, the evidence that Alexander signed the Watson CMN without treating the patient was sufficient to support her conviction. In any event, the record contained ample evidence from which the jury could have inferred that Delellis paid Alexander. For example, the evidence included recorded statements made by DeLellis that she had paid Alexander to sign the Watson CMN. Additionally, on the date that Delellis told Fairbrother that she had paid Alexander to sign the CMN, a withdrawal was made from DPI's account in the vicinity of Alexander's office. Accordingly, the admission of the diagram was at most harmless error, and does not warrant reversal.

D.  The Government's Closing Statements

Alexander cites several statements that the government made in its closing argument that, for the first time on appeal, she argues were improper. She contends that the government attempted to appeal to the emotions of the jury by arguing that this case was about protecting Medicare beneficiaries, that Alexander had violated the trust given to her as a doctor in her role as "gate keeper" to the Medicare system, and in doing so had acted "calloused" and may have harmed

18

patients. Alexander also contends that the government attempted to shift the burden of proof when it argued that her closing statements attempted to create reasonable doubt, were not supported by the evidence and did not contradict the evidence adduced in the government's case. Finally, Alexander states that the government misused character evidence by arguing that, because Alexander had allegedly accepted kickbacks before, the jury could infer that she had done so in this case.

Because Alexander did not object to the government's closing arguments at trial, "relief is available to rectify only plain error that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial." See United States v. Bailey, 123 F.3d 1381, 1400 (11th Cir. 1997) (citations omitted). We have stated that "[a]lthough a prosecutor may not make an argument directed to passions or prejudices of the jurors instead of an understanding of the facts and law . . . , there is no prohibition on colorful and flamboyant remarks if they relate to the evidence adduced at trial." Id. (internal quotation and citation omitted). We have also held that "a comment by the prosecutor on the failure by defense counsel, as opposed to the defendant, to counter or explain evidence" does not amount to improper burden-shifting. United States v. Hernandez, 145 F.3d 1433, 1439 (11th Cir. 1998).

19

The remarks made by the government during closing did not "jeopardize the fairness and integrity of the trial." See Bailey, 123 F.3d at 1400. All of the statements that Alexander contests related to the evidence presented at trial or were permissible observations that Alexander's defense did not contradict the evidence the government offered. See Hernandez, 145 F.3d at 1439. Moreover, to the extent the government violated Federal Rule of Evidence 404(b) by using evidence of prior kickbacks to persuade the jury that Alexander accepted a kickback in this case, the remarks did not rise to the level of plain error. As previously discussed, there was sufficient circumstantial evidence in the record to support the inference that Alexander accepted payment in exchange for signing CMNs. Cf. United States v. Blakely, 14 F.3d 1557, 1560 (11th Cir. 1994) (prosecution's reference, during closing argument, to defendant as "professional criminal" was "clearly improper" where it was "based on facts not admitted as evidence"). Thus, Alexander is not entitled to relief on the basis of the prosecution's closing remarks.

E. Cumulative Error

Lastly, we must determine whether the errors alleged, even if independently harmless, cumulatively worked to deprive Alexander of a fair trial. We have recognized that "the cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error." Baker, 432 F.3d at

20

1223 (citation omitted).  We determine the harmlessness of cumulative error by "look[ing] to see whether the defendant's substantial rights were affected." Id. (citation and quotation omitted).

At most, the erroneously admitted evidence in this case consisted of the government's summary exhibit and Delellis's hearsay statement to Ford during the execution of the search warrant.  Despite any error with respect thereto, the jury had before it sufficient evidence to convict Alexander for filing a false claim.  The evidence included a CMN for a wheelchair for Watson submitted by DPI for reimbursement under the Medicare plan.  Alexander was listed on Watson's CMN as the treating physician and her signature appeared on the form.  Alexander never treated Watson, however, because he was a fictitious person created by the government.  Ford testified that the signature on the CMN for Watson was similar to signatures that appeared on CMNs filed by patients that Alexander had treated and that Alexander admitted the signature on the Watson CMN was hers.  The evidence also included recorded conversations between Delellis and Fairbrother during which Delellis indicated that she had an ongoing referral relationship with Alexander and had paid Alexander to sign the CMN.  The date on which DeLellis told Fairbrother she had Alexander's signature was the same date on which the CMN for Watson was completed and the same date that DeLellis made a

21

withdrawal from an ATM in the vicinity of Alexander's office. In light of this evidence, and upon reviewing the record, we find that cumulative error did not effect the outcome of the trial.

## III. CONCLUSION

Alexander appealed her conviction of presenting false claims against the government under 18 U.S.C. § 287. Because she has identified no reversible evidentiary error, we **AFFIRM** her conviction.